UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

LANCE REBERGER,

                                    Petitioner,

        v.

RENEE BAKER, *et al.*,

                                    Respondents.

Case No. 3:13-cv-00071-MMD-CLB

ORDER

I.      **SUMMARY**

        Petitioner Lance Reberger filed a petition for writ of habeas corpus ("Petition") under 28 U.S.C. § 2254. This matter is before the Court for adjudication of the Petition's merits. For the reasons discussed below, the Court grants Reberger habeas relief on Ground One's *Napue* claim, and grants a certificate of appealability for Ground One's *Brady* claim, but denies Reberger relief on his remaining grounds.

II.     **BACKGROUND**

        Reberger's convictions are the result of events that occurred in Clark County, Nevada on November 4, 1990. (ECF No. 31-7 at 2.) Reberger and Amber Harvey entered an adult video and bookstore on the morning of November 4, 1990, at approximately 3:30 a.m. (ECF No. 29-2 at 13-14.) After speaking with the store clerk and watching some videos, Harvey stole some money and merchandise. (*Id.* at 17-20.) Reberger then took the store clerk into the back of the store and shot him three times in the head. (*Id.* at 21-22; *see also* ECF No. 28-3 at 75.) Reberger grabbed more money and the store's cameras, and Reberger and Harvey drove away. (ECF No. 29-2 at 22.) After disposing of the cameras, their clothing, and some of the merchandise in the

desert, Reberger and Harvey eventually drove to Coos Bay, Oregon where they were apprehended by local law enforcement. (*Id.* at 22-23, 25-29.)

Following a jury trial, Reberger was found guilty of burglary, robbery with the use of a deadly weapon, and murder with the use of a deadly weapon. (ECF No. 31-7 at 2.) Reberger was sentenced to six years for the burglary conviction; ten years for the robbery conviction with an additional ten years for the deadly weapon enhancement, to run consecutive to the burglary sentence; and life with the possibility of parole for the murder conviction with an additional life with the possibility of parole for the deadly weapon enhancement, to run consecutive to the robbery sentence. (*Id.* at 3.) Reberger appealed, and the Nevada Supreme Court dismissed the appeal on May 26, 1995. (ECF No. 32-1.) Remittitur issued on June 14, 1995. (ECF No. 32-2.)

Reberger filed a state habeas corpus petition on January 30, 1996. (ECF No. 32-5.) Following the appointment of "five different attorneys over the course of ten (10) years," Reberger filed a counseled, supplemental petition on June 25, 2007; however, this supplemental petition was later stricken. (ECF No. 32-43 at 2, 14.) Following nine evidentiary hearings, the state district court denied Reberger's petition on January 19, 2012. (ECF No. 38.) Reberger appealed, and the Nevada Supreme Court affirmed on December 12, 2012. (ECF No. 38-9.) Remittitur issued on January 7, 2013. (ECF No. 38-10.)

Reberger dispatched his federal habeas corpus petition on February 10, 2013. (ECF No. 1-2 at 36.) Reberger thereafter filed a counseled, first amended federal petition on January 6, 2014. (ECF No. 16.) On January 15, 2014, Reberger moved for a stay and abeyance to allow him to return to state court to exhaust Ground One of his federal petition. (ECF No. 41.) This Court granted the motion and stayed this action. (ECF No. 48 at 9.)

On January 14, 2014, Reberger filed a counseled, second state habeas petition. (ECF No. 42-1.) Reberger later filed a counseled, amended petition and a counseled, supplemental petition on May 12, 2014, and June 25, 2014, respectively. (ECF Nos. 54,

54-7.) Following two evidentiary hearings, the state district court dismissed Reberger's petition. (ECF Nos. 55-5, 55-8, 56-3.) Reberger appealed, and the Nevada Supreme Court affirmed on January 12, 2017. (ECF No. 57-3.) Remittitur issued on February 6, 2017. (ECF No. 57-4.)

On March 22, 2017, Reberger moved to reopen this federal action. (ECF No. 51.) This Court granted the motion and ordered that the stay be lifted. (ECF No. 64 at 2.) Reberger then filed his counseled, second amended federal petition on April 19, 2017. (ECF No. 65.) Respondents moved to dismiss claims within Reberger's second amended petition. (ECF No. 66.) The Court granted the motion in part and denied it in part. (ECF No. 94.) Specifically, Ground 9I, 10A, 10B, and 10C were dismissed as procedurally defaulted; and Grounds 2 and 3 were dismissed as noncognizable. (*Id.* at 13.) Respondents answered the remaining claims on May 29, 2018. (ECF No. 96.) Reberger replied on October 25, 2018. (ECF No. 101.)

In his remaining claims, Reberger asserts the following violations of his federal constitutional rights:

1. The State suppressed evidence that Harvey had a deal to receive a reduced sentence in exchange for her testimony against him.
4. The state district court erred in allowing a jailhouse informant to testify.
5. There were cumulative errors of prosecutorial misconduct.
6. The testimony of Harvey was improper.
7. The jury engaged in premature deliberations.
8. The state district court erred in refusing to give two proposed jury instructions.
9A. His trial counsel failed to call Corrine Kemp.
9B. His trial counsel failed to investigate and call alibi witnesses.
9C. His trial counsel improperly waived his speedy trial rights.
9D. His trial counsel introduced incriminating evidence against him.
9E. His trial counsel failed to sufficiently challenge letters he allegedly wrote to Harvey.
9F. His trial counsel failed to challenge Detective Perkins' testimony.
9G. His trial counsel failed to challenge the search warrant.

9H.     His trial counsel failed to object to Jury Instruction Number 16.

(ECF No. 65 at 21-93.)

## III.     LEGAL STANDARD

28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in habeas corpus cases under the Antiterrorism and Effective Death Penalty Act ("AEDPA"):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409-10) (internal citation omitted).

The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has stated "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult to meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt") (internal quotation marks and citations omitted).

## IV.    DISCUSSION

The Petition asserts seven remaining grounds for relief. (ECF No. 65 at 21-93.) The Court will address each ground in turn.

### A.    Ground One

In Ground One, Reberger alleges that his federal constitutional rights were violated when the state district court suppressed evidence that Harvey had a deal to receive a reduced sentence in exchange for her testimony. (ECF No. 65 at 21.) Reberger's claim is based on violations of *Brady v. Maryland*, 373 U.S. 83 (1963) and *Napue v. Illinois*, 360 U.S. 264, 269 (1959). (*Id.* at 48.) In Reberger's appeal of the denial of his second state habeas petition, the Nevada Supreme Court held:

> Reberger contends that the district court erred in denying his claim that the State improperly withheld *Brady* [*v. Maryland*, 373 U.S. 83 (1963)] evidence that would have impeached the State's primary witness and his codefendant, Amber Harvey. "To prove a *Brady* violation, the accused must make three showings: (1) the evidence is favorable to the accused, either because it is exculpatory or impeaching; (2) the State withheld the evidence, either intentionally or inadvertently; and (3) prejudice ensured, i.e., the evidence was material." *State v. Huebler*, 128 Nev. 192, 198, 275 P.3d 91, 95 (2012) (internal quotation marks omitted). Demonstrating the second and third elements of a *Brady* claim satisfies the good cause and prejudice requirements to overcome the procedural bars. *Id.* The district court found that the State withheld favorable evidence but that the evidence was not material. We agree.

The district court's finding that the State withheld favorable evidence is supported by significant evidence in the record. The State agreed not to oppose Harvey's postconviction efforts to reduce her sentence in exchange for her withdrawing her appeal and testifying against Reberger. Harvey performed her part of the bargain despite knowing the initially contemplated vehicle for the agreement was not available. At Reberger's trial, Harvey denied having any deal with the State and said she was testifying only because she wanted Reberger to pay for his actions. After Reberger's conviction, the State not only failed to oppose the [sic] Harvey's facially deficient postconviction efforts to reduce her sentence but entered into a guilty plea agreement with her before the district court granted the postconviction relief. [Footnote 2: After Reberger was convicted, Harvey, who had been convicted of the same crimes, filed a motion for new trial based on newly discovered evidence. The new evidence was introduced at Reberger's trial and suggested that he and not Harvey was the shooter. However, because the State had conceded at Harvey's trial that she was not the shooter, the new evidence could not have "render[ed] a different result probable upon retrial." *Sanborn v. State*, 107 Nev. 399, 406, 812 P.2d 1279, 1284-85 (1991) (setting forth the elements necessary to obtain a new trial based on newly discovered evidence).]

The district court also correctly concluded that the evidence was not material. Because Reberger had specifically requested evidence of a deal between the State and Harvey, the withheld evidence is material if there is "a reasonable possibility that the claimed evidence would have affected the judgment of the trier of fact, and thus the outcome of the trial." *Jimenez v. State*, 112 Nev. 610, 619, 918 P.2d 687, 692 (1996) (emphasis, quotation marks omitted). Although the withheld evidence constituted new and different impeachment evidence of the State's key witness, it does not undermine confidence in the outcome of the trial because, unlike in *Wearry v. Cain*, 136 S. Ct. 1002, 1006 (2016), there was sufficient independent evidence of Reberger's guilt. Overwhelming evidence points to Harvey's involvement in the crimes, and independent witnesses and evidence indicated Reberger and Harvey were together shortly before and after the crimes, they fled the state together despite having only recently met, and Reberger's own letters to and a conversation with Harvey while in jail indicated his participation in the crimes. For the same reason, Reberger's claim that the State violated *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (holding it is a constitutional violation for the State to obtain a conviction through knowing use of false evidence or failing to correct false evidence when it appears), also fails. *See Giglio v. United States*, 405 U.S. 150, 154 (1972) (applying a *Brady* materiality test to a *Napue* claim).

(ECF No. 57-3 at 3-5.)[1]

---

[1]The Court previously determined that this ground was not procedurally barred from federal habeas review because the Nevada Supreme Court's decision on this ground did not rest on an independent and adequate state ground; rather, the Nevada

### 1. Factual background

Following a jury trial, Harvey was found guilty of burglary, robbery with the use of a deadly weapon, and first-degree murder with the use of a deadly weapon on September 13, 1991. (ECF No. 21-4.) Harvey was sentenced and appealed on November 21, 1991. (ECF Nos. 22, 22-2.) On July 14, 1992, Harvey's trial counsel, Robert Miller, sent Harvey a letter stating that he had enclosed "copies of the Motion for Voluntary Dismissal of Appeal and [his] accompanying affidavit." (ECF No. 53-1.) Miller indicated that "Lance's trial has been put off until November, but we need to proceed with this part of the negotiations immediately." (*Id.*)

Thereafter, on August 4, 1992, Miller moved for voluntary dismissal of Harvey's appeal. (ECF No. 23-3.) Miller stated "[t]hat the present Motion for Voluntary Dismissal of Appeal is brought pursuant to and in accordance with negotiations entered into with the Clark County District Attorney's office" and that "[t]he substance of those negotiations is that Appellant Harvey would agree to voluntary dismissal of the present appeal and would agree to testify truthfully at the trial" of Reberger. (*Id.* at 3.) In exchange for Harvey's testimony, "the State agree[d] not to oppose Appellant Harvey's petition for post-conviction relief, the granting of which would result in amendment of the judgment of conviction to reflect omission of the life imprisonment sentence" for the deadly weapon enhancement. (*Id.* at 3-4.) Reberger's trial counsel "d[id] not remember ever seeing this motion" prior to November 21, 2013, approximately twenty years after Reberger's trial took place. (ECF No. 38-14 at 2; *see also* ECF No. 38-13 at 2.) The Nevada Supreme Court granted Harvey's motion. (ECF No. 23-4.)

On November 5, 1992, Reberger, through one of his trial counsel, Philip Dunleavy, moved to limit Harvey's testimony at his trial, explaining, in part, that "[t]he State has requested that Ms. Harvey waive her right to an appeal and testify in exchange for which they have agreed to request the Judge to resentence her to only one life with and run

Supreme Court's federal *Brady* analysis controlled the outcome of its state procedural default analysis. (ECF No. 94 at 8-9.)

everything else concurrent or dismiss the remaining sentence." (ECF No. 23-7 at 4.) Dunleavy later explained that "[a]t some point prior to Reberger's trial, I heard through word of mouth, rumor, and gossip around the courthouse that . . . Harvey[ ] had negotiated a deal with the prosecution to testify against Reberger at his trial." (ECF No. 38-14 at 2.) The State opposed Reberger's motion's explaining, in part, that "the State has no agreement with Amber Harvey and does not know if she will even testify." (ECF No. 23-8 at 11.) At a hearing on Reberger's motion, Miller stated that "[t]he status of [Harvey's] case is that we, at one point, thought that we had negotiations on the case, which would involve her amending her appeal, there being a reduction in the sentence that she was facing, and that she would be testifying truthfully concerning this incident." (ECF No. 23-11 at 20.) However, it was determined by Miller and the State "that those negotiations would not be something that could legally be consummated. There is no authority to reduce the sentences that were imposed by the jury." (*Id.*) It does not appear that there was any effort made to reinstate Harvey's appeal. (ECF No. 55-5 at 189-190.)

On December 29, 1992, Reberger moved for an in-camera inspection of the State's file in regards to any deal between Harvey and the State, explaining that "[c]ounsel for Defendant is concerned that there may be some agreement and/or understanding between counsel for the State and counsel for Ms. Harvey which would allow the [previous] negotiations to come to actually be entered into." (ECF No. 24 at 4.) The state district court granted the motion. (ECF No. 24-1 at 3.)

Reberger's first trial began on December 29, 1992, but it ended in a mistrial. (*See* ECF Nos. 24-1, 26-1 at 72.) During opening statements for Reberger's second trial, the State commented that "[y]ou are going to hear why [Harvey] wants to testify," and Harvey "is going to get up here and she is going to tell you if the State gave her any kind of deal to testify." (ECF No. 28 at 9, 38.) Harvey later testified as a State witness. (ECF No. 29-2 at 9.) Harvey responded in the negative when asked if she was "testifying because of any kind of deal that the State ha[d] given [her]." (*Id.* at 10-11.) And Harvey responded in the affirmative when asked if she "originally ha[d] an offer of a deal made to [her]" and

when asked to elaborate replied, "for whatever reason, that deal is no longer open." (*Id.* at 11.) Harvey explained that she was testifying "[b]ecause [she] want[ed] Lance to pay for what he did." (*Id.*) During cross-examination, Harvey testified that the State had "dropped [a grant of immunity] too" and that she was "down here because [she] want[ed] to testify." (*Id.* at 55.)[2]

Harvey testified that she and Reberger went to the Fantasy Video Adult Bookstore on November 4, 1990, with a ".22 nickel pistol gun that belonged to [Harvey's] ex-husband." (ECF No. 29-2 at 9, 13-14.) It was Reberger's idea to go to that location to commit a robbery "because [he] kn[e]w the roots to it" since "[a] friend of [his] used to work there." (*Id.* at 16.) When they entered the store, Reberger "had the gun and [Harvey] had [Reberger's] knife." (*Id.* at 17.) After Reberger and Harvey talked to the store clerk and watched some movies, Reberger brought the store clerk "out of the back" with a gun to the store clerk's head and Harvey held a knife under his chin. (*Id.* at 17, 19-20.) Harvey then took some money out of the cash register and some store merchandise. (*Id.* at 20.) Reberger walked the store clerk to the back of the store while pointing a gun at the back of his head, and Harvey told Reberger to "'[d]o whatever you have to do.'" (*Id.* at 21.) Harvey then heard three gunshots while Reberger and the store clerk were in the back of the store. (*Id.* at 22.) Harvey started their vehicle, and Reberger "came running out with the cameras and the gun and the rest of the money." (*Id.*)

Harvey and Reberger disposed of the cameras, their clothing, and some merchandise in the desert and went to a hotel to take a shower. (*Id.* at 22-23.) After leaving the hotel, they went to Harvey's ex-husband's house to return the gun and "d[o] some drugs." (*Id.* at 25.) They then left with Harvey's son and drove to Los Angeles, then San Francisco, and finally Coos Bay, Oregon. (*Id.* at 25-26, 28.) Harvey and Reberger were arrested in Coos Bay. (*Id.* at 29.)

_____

[2]During closing arguments, the State commented, "Amber testified because she is doing life in prison . . . . She does not feel it's fair that he is not." (ECF No. 30-3.)

Following Reberger's trial, on August 17, 1993, Harvey moved for a new trial based on newly discovered evidence. (ECF No. 31-9.) Harvey explained that "evidence was adduced [at Reberger's trial] that Reberger had forged a letter from Amber Harvey" and that "[t]his evidence was not available at the time of Defendant Harvey's trial and constitutes newly discovered evidence." (*Id.* at 4.) It does not appear that the State opposed Harvey's motion. (*See* ECF No. 54-5 at 2 (declaration from an investigator of the Federal Public Defender's office that "[t]here is no opposition to the 1993 motion for a new trial in Harvey's court file"); *see also* ECF No. 55-4 at 2 (stipulation by the parties that "[a] written opposition from the District Attorney's Office to the Motion for a New Trial based on Newly Discovered Evidence" does not appear in Harvey's Eighth Judicial District Court's file); ECF No. 55-8 at 175-76.)

A few weeks after filing the motion, on September 3, 1993, Miller sent Harvey a letter enclosing a guilty plea memorandum that "eliminate[d] the use of a deadly weapon enhancement on the murder charge and . . . eliminate[d] one of the two life sentences." (ECF No. 53-10 at 2.) The guilty plea agreement provided that in exchange for pleading guilty, Harvey's use of a deadly weapon enhancement would be dropped from the murder count, the recommended sentence on the murder count would be life imprisonment with the possibility of parole, and it would be recommended that sentences on all counts run concurrently. (ECF No. 53-6 at 2.)

A hearing was held on Harvey's motion. (ECF No. 31-14.) The motion was granted without argument, although the state district court indicated that it "ha[d] a copy of [the State's] opposition." (*Id.* at 3.) When the state district court asked what the parties "we[re] going to do," Miller responded that the parties had entered into negotiations whereby the State had agreed to drop the deadly weapon enhancement on the murder count. (*Id.* at 3-4.) Thereafter, during the same hearing, Harvey pleaded guilty pursuant to the plea agreement, and the state district court sentenced her. (*Id.* at 5.) Harvey's guilty plea memorandum does not appear in her court file. (*See* ECF No. 54-5 at 2; ECF No. 55-4 at 2.)

Years later, on June 11, 2010, during Reberger's first state habeas evidentiary hearing proceedings, William Kephart, the prosecutor in Reberger's case, explained that Harvey's trial counsel moved for a new trial, and the state district court "represented on the record that he was going to grant a new trial," so "they renegotiated." (ECF No. 35-5 at 31.) Kephart also explained that "[t]here [were] no deals given to her, nothing" and it would not make sense to negotiate for her testimony that had already been given. (*Id.* at 31, 33.) Kephart then took the stand and testified that the State did not have "negotiations with Amber Harvey for her testimony in [Reberger's] 1993 trial." (*Id.* at 44, 54, 57.)

In October 2011, Harvey had a hearing before the parole board. (ECF No. 38-19.) Harvey told the parole board that she "testified against [Reberger] and got some of [her] time dropped." (*Id.* at 4.) Years later, on January 8, 2015, during Reberger's second state habeas evidentiary hearing proceedings, Harvey, in response to the question "[d]id you get some of your time dropped as a result of your testimony" against Reberger, responded, "Yeah. But that still wasn't the deal. The first degree murder was supposed to be dropped." (ECF No. 55-5 at 99, 115.) Harvey also testified that she "was promised that if [she] testified and showed those letters that [Reberger] wrote [her], that they would drop that." (*Id.* at 123.) Harvey explained that she lied at Reberger's trial when she testified that there was no deal for her testimony "because [she] said what they told [her] to say." (*Id.* at 127.)

### 2. Brady

"[T]he suppression by the prosecutor of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. Because a witness's "'reliability . . . may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within [the *Brady*] rule." *Giglio v. United States*, 405 U.S. 150, 154 (1972) (quoting *Napue*, 360 U.S. at 269). "There are three components of a true *Brady* violation: The evidence at issue must be

favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). The materiality of the evidence that has been suppressed is assessed to determine whether prejudice exists. *See Hovey v. Ayers*, 458 F.3d 892, 916 (9th Cir. 2006). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). Accordingly, "[a] 'reasonable probability' of a different result is . . . shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Id.* (quoting *Bagley*, 473 U.S. at 678).

Addressing the first *Brady* prong, the Nevada Supreme Court reasonably concluded that a deal between the State and Harvey was favorable evidence. Indeed, because Harvey was a crucial witness for the State, as she was the only eyewitness, a deal whereby she received a reduced sentence for her testimony undermines her credibility and reliability. *See Giglio*, 405 U.S. at 154. This evidence would certainly have been helpful to Reberger's defense. *See, e.g.*, *Davis v. Alaska*, 415 U.S. 308, 316-17 (1974) ("[T]he exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.").

Turning to the second *Brady* prong, the Nevada Supreme Court reasonably concluded that a deal between the State and Harvey was suppressed. In fact, Respondents do not appear to dispute this conclusion. (*See* ECF No. 96 at 20.)

First, evidence reasonably supports the conclusion that the State made a deal with Harvey before she testified against Reberger in his second trial. Harvey voluntarily dismissed her appeal of her judgment of conviction because she had entered into

negotiations with the State whereby she would testify against Reberger in return for the dismissal of the deadly weapon enhancement and a reduction in her sentence. (ECF No. 23-3 at 3-4.) Miller later explained that the agreement between the State and Harvey did not come to fruition because "[t]here is no authority to reduce the sentences that were imposed by the jury," however, Miller did not attempt to reinstate Harvey's appeal after the agreement allegedly fell through. (ECF No. 23-11 at 20; ECF No. 55-5 at 189-190.) After Harvey testified against Reberger and confirmed that there was no deal made for her testimony (*see* ECF No. 29-2 at 10-11), Harvey moved for a mistrial (ECF No. 31-9). The State did not oppose Harvey's motion (*see* ECF No. 54-5 at 2; ECF No. 55-4 at 2; ECF No. 55-8 at 175-76), and, prior to a hearing taking place on the motion, Harvey signed a guilty plea agreement which, in line with the original negotiations with the State, dismissed the deadly weapon enhancement (ECF No. 53-6 at 2). The state district court granted the motion for a new trial without argument or discussion, accepted Harvey's guilty plea, and resentenced Harvey in the course of one undisputed hearing. (ECF No. 31-14.) Later, Harvey testified at her parole hearing and at Reberger's second state postconviction evidentiary hearing that the State had promised to reduce her charges if she testified against Reberger. (ECF No. 38-19 at 4; ECF No. 55-5 at 99, 115, 123.) This evidence demonstrates that the Nevada Supreme Court reasonably determined that a deal existed between the State and Harvey. Indeed, this evidence demonstrates that a deal was initially made between the State and Harvey prior to Reberger's trial, and even though it was allegedly abandoned, the same terms of the deal were later revived following Reberger's trial. *See, e.g.*, *United States v. Shaffer*, 789 F.2d 682, 690 (9th Cir. 1986) ("While it is clear that an explicit agreement would have to be disclosed because of its effect on [the witness]'s credibility, it is equally clear that facts which imply an agreement would also bear on [the witness]'s credibility and would have to be disclosed.").

Regarding suppression, the State never provided Reberger with Harvey's motion for voluntary dismissal of her appeal even after the state district court granted

Reberger's request for an in-camera inspection of the State's file (ECF No. 38-14 at 2; ECF No. 38-13 at 2); the State made comments during its opening statement at Reberger's trial that Harvey was not offered a deal for her testimony (ECF No. 28 at 9, 38); the State continued to deny that any deal was made to Harvey for her testimony (*see* ECF No. 35-5 at 54, 57); and Harvey testified at Reberger's second state postconviction evidentiary hearing that she was instructed to lie at Reberger's trial regarding the lack of a deal (ECF No. 55-5 at 127). This evidence demonstrates that the Nevada Supreme Court reasonably determined that the State suppressed the deal.

Turning to the final *Brady* prong, materiality, Reberger asserts that this Court's review should be de novo because the Nevada Supreme Court used a sufficiency of the evidence standard to assess materiality instead of using the test outlined in *Kyles*. (ECF No. 101 at 50-52.) To be sure, the Supreme Court explained that a *Brady* materiality assessment "is not a sufficiency of evidence test." *Kyles*, 514 U.S. at 434. However, even though the Nevada Supreme Court reasoned that "there was sufficient independent evidence of Reberger's guilt," its holding that the suppressed evidence "does not undermine confidence in the outcome of the trial" was in line with *Kyles*. (ECF No. 57-3 at 4.) Indeed, it appears that the Nevada Supreme Court was merely assessing the remainder of the evidence presented against Reberger in order to determine whether "the favorable evidence could reasonably be taken to put the whole case in such a different light." *Kyles*, 514 U.S. at 435. Accordingly, this Court is unpersuaded that its review of the materiality prong is de novo.

Reberger points out that the Nevada Supreme Court noted in his first state habeas appeal that "[t]he State's case against [Harvey] was based primarily on the testimony of [Harvey]" (ECF No. 38-9 at 4-5), and as such, evidence impeaching her credibility is material. *See Giglio*, 405 U.S. at 154-55 (determining that a witness' credibility was "an important issue in the case, and evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it"); *see also Silva v. Brown*, 416 F.3d 980, 987 (2005)

14

("Impeachment evidence is especially likely to be material when it impugns the testimony of a witness who is critical to the prosecution's case."). However, importantly, the Nevada Supreme Court also reasonably noted in the same sentence that Harvey's testimony "was corroborated by [Reberger's] own incriminating writings." (ECF No. 38-9 at 4-5.) In fact, as is discussed further in Ground Nine, Subpart E, Reberger wrote letters to Harvey stating, among other things, that "[w]e fucked up, I am is [sic] good as dead[,] you will be out in 10 or 20 years if your [sic] lucky but not me[.] . . . we should have never done it in the first place now we are going to pay for it big time." (ECF No. 18-9 at 3.) In another letter, Reberger wrote, "[y]ou don't know how he died only I know how." (ECF No. 19 at 4.) Further, the State introduced evidence from Andrew Jackson, a corrections officer for the Coos County Sheriff's Department, who testified, among other things, that he heard Reberger tell Harvey "that she doesn't have anything to worry about because she wasn't in the back room when it happened." (ECF No. 29 at 4, 10.)

Thus, although Harvey provided the only eyewitness testimony to the crimes, her testimony that Reberger shot the victim was corroborated by other evidence. *See Smith v. Cain*, 565 U.S. 73, 76 (2012) ("[O]bserv[ing] that evidence impeaching an eyewitness may not be material if the State's other evidence is strong enough to sustain confidence in the verdict."); *cf. Banks v. Dretke*, 540 U.S. 668, 700-01 (2004) (holding that impeachment evidence was material where it pertained to a witness whose testimony, which was "uncorroborated by any other witness," was "crucial to the prosecution"); *Wearry v. Cain*, 136 S. Ct. 1002, 1006-1007 (2016) (determining that there was a lack of confidence in the jury's verdict due to the suppression of evidence related to two witnesses' motivations for testifying because "the only evidence directly tying [the defendant] to th[e] crime was [one witness's] dubious testimony, corroborated by the similarly suspect testimony of [the other witness]"); *Hayes v. Brown*, 399 F.3d 972, 985 (9th Cir. 2005) (finding suppressed evidence material where tainted witness's testimony "was the centerpiece of the prosecution's case" and "[n]early all of the other evidence against Hayes was circumstantial"). Because Harvey's testimony was corroborated by

Reberger's own statements, the Nevada Supreme Court reasonably concluded that the confidence in the outcome of Reberger's trial was not undermined by the State's suppression of its deal with Harvey. *See Kyles*, 514 U.S. at 434. Accordingly, it cannot be concluded that "there [was] a reasonable probability that, had the evidence [that there was a deal between Harvey and Reberger] been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682.

### 3. *Napue*

"[A] conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." *Napue*, 360 U.S. at 269. This rule applies "when the State, although not soliciting false evidence, allows it to go uncorrected when it appears" and when "the false testimony goes only to the credibility of the witness." *Id.* A *Napue* violation claim will succeed when "(1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) the false testimony was material." *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (internal quotation marks and alternation omitted). "[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *United States v. Agurs*, 427 U.S. 97, 103 (1976).

Reberger asserts that this Court's review of his *Napue* claim should be de novo because the Nevada Supreme Court improperly applied the *Brady* materiality analysis to the *Napue* materiality analysis. (ECF No. 101 at 65.) To be sure, the Ninth Circuit has explained that "[t]he *Napue* materiality standard is less demanding than *Brady*." *Reis-Campos v. Biter*, 832 F.3d 968, 976 (9th Cir. 2016). However, the Court is unconvinced that the Nevada Supreme Court used the wrong materiality analysis. The Nevada Supreme Court cited *Giglio*, which cites to the proper *Napue* materiality standard. *See Giglio*, 405 U.S. at 154 ("A new trial is required if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury.'").

Turning next to the Nevada Supreme Court's rejection of Reberger's *Napue* claim, the Nevada Supreme Court, through its *Brady* discussion, appears to have implicitly and reasonably concluded that Reberger satisfied the first two factors under *Naupe.* Indeed, because the underlying facts of the *Brady* and *Napue* claims are so intertwined, the analysis for the first two *Napue* factors are the same as *Brady*. During Harvey's testimony, she explained, in response to the State's questions, that she was not "testifying because of any kind of deal that the State ha[d] given [her]" but "[b]ecause [she] want[ed] Lance to pay for what he did." (ECF No. 29-2 at 10-11.) Harvey also explained that she "originally ha[d] an offer of a deal made to [her]," but, "for whatever reason, that deal is no longer open." (*Id.* at 11.) As was discussed previously, the Nevada Supreme Court reasonably determined in its *Brady* analysis that there was a deal—fluid or not—between the State and Harvey for her testimony against Reberger. Therefore, Harvey's foregoing testimony was false, and the State, a party to that deal, knew or should have known that the testimony was false.[3] *See Hayes*, 399 F.3d at 984.

However, the Nevada Supreme Court's conclusion as to materiality under *Naupe*'s less demanding materiality standard was objectively unreasonable. As discussed *supra*, the State elicited and failed to correct Harvey's crucial false evidence. And Harvey's false testimony failed to alert the jury to the fact that she was testifying in return for a reduced sentence. This information would have cast great doubt on her credibility, and because Harvey was the only eyewitness to the crimes, her credibility was central to the State's case and to Reberger's convictions. This false testimony about the lack of a deal between the State and Harvey for her testimony played a significant

---

[3]In fact, the evidence supports the reasonable inference that the State intentionally solicited false testimony knowing it was false, or at a minimum, knew that the testimony was false after Harvey testified and did nothing to correct it. As discussed *supra,* at Reberger's second trial, the State represented in its opening statement that Harvey was expected to testify that she was not given any kind of deal to testify which was contrary to the negotiations and deal reached by then (ECF No. 28 at 9, 38), and Harvey testified as the State represented—that she did not have a deal when asked (ECF No. 29-2 at 10-11). As Harvey later testified, she was directed to lie about the lack of a deal. (ECF No. 55-5 at 127.)

role in the jury's credibility evaluation of Harvey; in fact, the jury was under the mistaken impression that Harvey was testifying for altruistic reasons only. Contrarily, Harvey testified against Reberger for her own self-interest: her second life sentence for the murder deadly weapon enhancement, which originally ran consecutive to her first life sentence for murder, was dismissed. (*Compare* ECF No. ECF No. 22 at 3 *with* ECF No. 31-14.) Reberger's resulting conviction "obtained by the knowing use of [Harvey's] perjured testimony is fundamentally unfair[.]" *Agurs*, 427 U.S. at 103. Moreover, due to the important role Harvey played in Reberger's trial and her false testimony that suppressed the fact that she was receiving an extraordinary reduction in her sentence in return for her testimony, "there is a[ ] reasonabl[e] likelihood that [her] false testimony could have affected the judgment of the jury." *Id.* Therefore, although the Nevada Supreme Court appears to have "identifie[d] the correct governing legal principle" to assess materiality under a *Napue* violation, "it unreasonably applie[d] that principle to the facts of [Reberger's] case." *Lockyer*, 538 U.S. at 75.

In sum, the Court finds that the Nevada Supreme Court's determination that Reberger failed to demonstrate materiality under a *Napue* violation was an objectively unreasonable application of clearly established federal law as determined by the Supreme Court of the United States. The Court therefore grants Reberger habeas corpus relief with respect to Ground One's *Napue* claim under 28 U.S.C. § 2254(d)(1).[4]

///

///

_____

[4]Reberger argues that he is entitled to dismissal of the charges, an immediate release from custody, and an order barring the State from retrying him due to the State's egregious misconduct. (ECF No. 101 at 69-70.) Alternatively, Reberger argues that this Court should issue a conditional writ, ordering that he be released from custody unless the State retries him within a certain period of time, and deny a stay if Respondents appeal. (*Id.* at 75.) While this Court agrees that the State's misconduct was outlandish, it does not agree that a dismissal of the charges or the denial of a stay if Respondents appeal are warranted. This Court will, however, order that Reberger be released from custody within 60 days unless the Respondents file a written notice of election to retry Reberger, and the State thereafter, within 180 days after the filing of that notice, commences proceedings toward the retrial.

## B. Ground Four

In Ground Four, Reberger alleges that his federal constitutional rights were violated when the state district court allowed an unreliable jailhouse informant to testify. (ECF No. 65 at 71.) In Reberger's appeal of his judgment of conviction, the Nevada Supreme Court held: "We remain unpersuaded by Reberger's argument[ that the district court erred] because . . . evidence independent of testimony rendered by . . . a jailhouse informant connected Reberger to the crimes, *see D'Agostino v. State*, 107 Nev. 1001, 823 P.2d 283 (1991)." (ECF No. 32-1 at 2.) Reberger also raised this claim in his appeal of the denial of his first state habeas petition, but the Nevada Supreme Court stated that the claim was barred by the doctrine of the law of the case because it had already held on direct appeal that the claim lacked merit. (ECF No. 38-9 at 8-9 & n.4.) In response to Respondents' contention in the motion to dismiss that Reberger raised this claim as a state-law claim only on direct appeal, this Court held that the Nevada Supreme Court implicitly considered the federal claims in the appeal of the denial of the state postconviction petition. (ECF No. 94 at 4.) As the Nevada Supreme Court only implicitly considered the federal claims, the question here is whether Reberger has shown that there was no reasonable basis for the Nevada Supreme Court to deny relief. *See Harrington*, 562 U.S. at 98 ("Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief.").

Dean Salvador Zuniga, Reberger's former cellmate, testified at Reberger's trial that he was contacted by Detective White of the Henderson Police Department in December 1992,[5] and told Detective White that Reberger had told him that "he capped" someone. (ECF No. 29-1 at 43-45, 50.) Zuniga explained that he understood this to mean that Reberger shot someone. (*Id.* at 46.) Reberger "didn't give the specifics" about the shooting. (*Id.* at 49.) In return for his testimony, Zuniga testified that Detective White

---

[5]Reberger's first jury trial commenced on December 29, 1992. (*See* ECF No. 24-1.)

said he would "speak on [Zuniga's] behalf" by writing a letter to the parole board. (*Id.* at 46-48; *see also id.* at 51, 81-82 (testimony of Detective White that he told Zuniga he would "write a letter stating his cooperation in this matter for them to consider when he came up for parole").)

"A habeas petitioner bears a heavy burden in showing a due process violation based on an evidentiary decision." *Boyde v. Brown*, 404 F.3d 1159, 1172 (9th Cir. 2005), *as amended on reh'g*, 421 F.3d 1154 (9th Cir. 2005). "[C]laims deal[ing] with admission of evidence" are "issue[s] of state law," *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009), and "federal habeas corpus relief does not lie for errors of state law." *Lewis v. Jeffers*, 497 U.S. 764 (1990). Therefore, the issue before this Court is "whether the state proceedings satisfied due process." *Jammal v. Van de Kamp*, 926 F.2d 918, 919-20 (9th Cir. 1991). In order for the admission of evidence to provide a basis for habeas relief, the evidence must have "rendered the trial fundamentally unfair in violation of due process." *Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir. 1995) (citing *Estelle v. McGuire*, 502 U.S. 62, 67 (1991)). Further, "[u]nder AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by 'clearly established Federal law,' as laid out by the Supreme Court." *Yarborough*, 568 F.3d at 1101 (citing 28 U.S.C. § 2254(d)); *see also Dowling v. United States*, 493 U.S. 342, 352 (1990) (explaining that the Supreme Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly"). Importantly, the Supreme Court "has not yet made a ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Id.*

Although there was a question about Zuniga's reliability, that is insufficient to demonstrate a due process violation. *See United States v. Berry*, 624 F.3d 1031, 1040 (9th Cir. 2010) ("In order . . . to succeed on [a] due process claim, it is not enough that the evidence introduced against [a petitioner] was of . . . questionable reliability."). Instead, Reberger "must establish that the evidence was so arbitrary that 'the factfinder

and the adversary system [were] not . . . competent to uncover, recognize, and take due account of its shortcomings.'" *Id.* (citing *Barefoot v. Estelle*, 463 U.S. 880, 899 (1983) *superseded on other grounds by* 28 U.S.C. § 2253(c)(2)); *see also United States v. Scheffer*, 523 U.S. 303, 313 (1998) ("Determining the weight and credibility of witness testimony . . . has long been held to be the 'part of every case [that] belongs to the jury.'") (quoting *Aetna Life Ins. Co. v. Ward*, 140 U.S. 76, 88 (1891).

Here, the jury was aware that Zuniga was a cellmate of Reberger's; that Zuniga had been convicted of stealing a car, stealing credit cards, and attempted coercion; and that Detective White promised to write a letter on Zuniga's behalf to the parole board if he testified. (ECF No. 29-1 at 44, 46-48.) Further, the jury was instructed that "[t]he credibility or believability of a witness should be determined by his manner upon the stand, his relationship to the parties, his fears, motives, interests or feelings, [and] his opportunity to have observed the matter to which he testified." (ECF No. 30-1 at 11.) The jury was also instructed that "[y]ou have heard testimony that the Defendant made an oral admission to a person in custody. Evidence of an oral admission by a Defendant ought to be viewed with caution." (*Id.* at 13.) Because the jury was aware of the potential shortcomings of Zuniga's testimony through cross-examination and the jury instructions and was able to weigh Zuniga's credibility in light of these shortcomings, it cannot be concluded that Reberger's trial was rendered fundamentally unfair. *See McGuire*, 502 U.S. at 67. Accordingly, because Reberger has not demonstrated unfairness and because the Supreme Court has not held that "overtly prejudicial evidence constitutes a due process violation," *Yarborough*, 568 F.3d at 1101, Reberger has failed to show that there was no reasonable basis for the Nevada Supreme Court to deny relief. *See Harrington*, 562 U.S. at 98.

Reberger is denied federal habeas relief for Ground Four.

**C.     Ground Five**

In Ground Five, Reberger alleges that his federal constitutional rights were violated due to the cumulative effect of prosecutorial misconduct. (ECF No. 65 at 72.)

Reberger alleges four instances of prosecutorial misconduct. (*See id.* at 72-76.) In Reberger's appeal of his judgment of conviction, the Nevada Supreme Court held: "We remain unpersuaded by Reberger's arguments [that the district court erred] because . . . alleged misconduct by the State did not materially affect the verdict when viewed in the context of the entire trial, *see Leonard v. State*, 108 Nev. 79, 824 P.2d 287 (1992)." (ECF No. 32-1 at 2-3.)

"[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). "The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). A court must judge the remarks "in the context in which they are made." *Boyde v. California*, 494 U.S. 370, 385 (1990). The fairness of a trial is measured "by considering, inter alia, (1) whether the prosecutor's comments manipulated or misstated the evidence; (2) whether the trial court gave a curative instruction; and (3) the weight of the evidence against the accused." *Tan v. Runnels*, 413 F.3d 1101, 1115 (9th Cir. 2005). "[P]rosecutorial misconduct[ ] warrant[s] relief only if [it] 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Wood v. Ryan*, 693 F.3d 1104, 1113 (9th Cir. 2012) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)).

### 1.  Subpart A

In Ground Five, Subpart A, Reberger alleges that his federal constitutional rights were violated when the state failed to disclose that Harvey had been described by the State as being "patently unreliable" in a different case. (ECF No. 65 at 72.)

During Reberger's trial, outside the presence of the jury, Reberger's trial counsel indicated to the state district court that "[i]t came to our attention accidentally last week that the State in fact has a document wherein Mel Harmon of the district attorney's office in another case filed a motion in which he referred to Amber Lynn Harvey as patently

unreliable." (ECF No. 29-1 at 4.) Reberger's trial counsel elaborated that "there is apparently extensive evidence that [Harvey] gave very inconsistent statements in another murder case, specifically Hagelmeyer" and that "we never found out about it until one of our investigators happened to be in another attorney's office and by accident noticed a file on his desk captioned Amber Lynn Harvey and asked about it." (*Id.*) Reberger's trial counsel explained that "if we'd had this weeks or months ago, we could have done an investigation to find out all the details." (*Id.* at 5.) The state district court stated that it did not "know if an opinion by a prosecutor in an adversary proceeding rises to the level of exculpatory evidence" because it is "argument of counsel[,] . . . not evidence." (*Id.* at 7.) The state district court then denied Reberger's motion, stating that the motion was in a different case filed by a different prosecutor. (*Id.* at 9.)

Harvey's testimony was presented later that day, and Reberger's trial counsel cross-examined Harvey regarding a statement she gave in the Hagelmeyer case and its similarity to a statement she made in Reberger's case. (ECF No. 29-2 at 2, 9, 62-63.) Harvey denied giving more than one statement in that case. (*Id.* at 63.) And as is explained further in Ground Six, Harvey was questioned about the prior inconsistent statements that she made in Reberger's case. (*See* ECF No. 29-2 at 30, 57-58, 61-62, 66, 88.)

Although information that the State opined that Harvey was unreliable in a different case may have been favorable to Reberger and may have been suppressed pursuant to *Brady*, the Nevada Supreme Court reasonably concluded that the verdict was not materially affected. Reberger's trial counsel questioned Harvey about the inconsistent statements she made in Reberger's case and about the similarities between Harvey's statement in the Hagelmeyer case and her statement to Detective Perkins in Reberger's case. Because Harvey was impeached with her prior statements, which cast doubt on her reliability, Reberger fails to demonstrate that the potential prosecutorial misconduct in suppressing additional impeachment evidence against Harvey dealing with reliability "had substantial and injurious effect or influence in determining the jury's

verdict." *Brecht*, 507 U.S. at 637-38. Accordingly, because the Nevada Supreme Court reasonably denied that there was prosecutorial misconduct warranting the granting of relief to Reberger, Reberger is denied federal habeas relief for Ground Five, Subpart A.

### 2. Subpart B

In Ground Five, Subpart B, Reberger alleges that his federal constitutional rights were violated when the State deliberately placed prejudicial information before the jury. (ECF No. 65 at 73.) Specifically, Reberger alleges that the State laid the autopsy photographs face up so that they were visible to the jury before they had been admitted and elicited evidence that Reberger was involved in an unrelated traffic stop. (*Id.*)

Regarding Reberger's first contention, Reberger's trial counsel explained to the state district court that during Reberger's first trial, which ended in a mistrial, "the prosecution had taken out the autopsy photos and laid them out on the table so the jury could see them. We would ask the Court to request them to keep them turned down until and unless they are admitted into evidence, then only publish them to the jury." (ECF No. 28 at 4.) The state district court indicated that it believed "that is appropriate." (*Id.*) Later, through the testimony of Giles Green, the coroner who performed the victim's autopsy, the autopsy photographs were admitted and published to the jury. (ECF No. 28-3 at 69-70, 85.) Outside the presence of the jury, Reberger's trial counsel indicated that the State again laid the photographs "face up on the desk facing the jury." (ECF No. 28-3 at 104.) The State admitted that the photographs "were face up, but there was only one of them that was actually viewable." (*Id.* at 105.) The state district court then stated that there was no prejudice because it did not "think it was intentional and [there was] only one photograph" that was later admitted. (*Id.*)

Turning to Reberger's second contention, Troy Hatch, an undercover narcotics detective with the Henderson Police Department, testified that he "ma[de] a traffic stop on October 25th of 1990 in reference to a black Chevrolet Camaro with Florida license plates." (ECF No. 28-4 at 28-29.) Detective Hatch explained Reberger was one of two occupants in the vehicle. (*Id.* at 29.) The State asked Detective Hatch if he "recall[ed] if

1  [Reberger] was driving or was the passenger." (*Id.* at 30.) Detective Hatch indicated that

2  Reberger was driving. (*Id.*) Detective Hatch then testified, "without going into the

3  particulars of the traffic stop itself," as the State requested, that he arrested the

4  passenger on an outstanding warrant. (*Id.*) Later, outside the presence of the jury,

5  Reberger's trial counsel explained that the State "didn't have to elicit testimony that

6  [Reberger] was the driver and it was a traffic stop." (*Id.* at 69.) The state district court

7  ruled that it was "not convinced that what happened even arose to the level to whereby

8  it was a previous criminal act" because "most of the discussion and the testimony was

9  surrounding the passenger who was wanted on some kind of felony warrant" and there

10 was no "indication that Mr. Reberger was wanted or anything or had to be charged or

11 was even ticketed for anything." (*Id.* at 70.)

12        Even if these two circumstances warranted a finding that the State committed

13 misconduct, the Nevada Supreme Court reasonably concluded that the jury's verdict

14 was not affected or influenced by the conduct. *See Brecht*, 507 U.S. at 637-38. First, the

15 jury was able to view the photographs shortly after they were allegedly improperly

16 displayed when they were subsequently published. And second, Detective Hatch did not

17 give any description of or reason for the traffic stop of Reberger's vehicle. Accordingly,

18 because the Nevada Supreme Court reasonably denied that there was prosecutorial

19 misconduct warranting the granting of relief to Reberger, Reberger is denied federal

20 habeas relief for Ground Five, Subpart B.

21        **3.  Subpart C**

22        In Ground Five, Subpart C, Reberger alleges that his federal constitutional rights

23 were violated when the State improperly commented on the reasonable doubt standard.

24 (ECF No. 65 at 74.) During the State's closing argument, the following colloquy occurred:

25        [THE STATE]:        . . . 27 times the defense made the statement not
                               beyond a reasonable doubt. Is that a defense, simply
26                             not beyond a reasonable doubt? Stand up here and
27                             say - -

28

25

| | |
|---|---|
| MR. DUNLEAVY: | Your Honor, I am going to object. This is a defense. That's the law. |
| [THE STATE]: | Is the statement not beyond a reasonable doubt a defense? Is he putting it forward now? |
| | Ladies and gentlemen, you read - - we will take some time. I will go through this right now with you. You are going to have the opportunity to read it. It's instruction number four. In that instruction, pay attention to the second paragraph. The second paragraph says: "A reasonable doubt is one based on reason. It is not mere possible doubt but is such a doubt as would govern or control a person in their more weighty affairs of life. If in the minds of the jurors, after the entire comparison and consideration of all of the evidence are in such a condition that they can say they fill [sic] an abiding conviction of the truth of the charge, there is not a reasonable doubt." Doubt must be reasonable. Doubt to be reasonable must be actual, not mere possibility or speculation. . . . |

(ECF No. 30-3 at 42-43.)

The Nevada Supreme Court's conclusion that the State's comment did not materially affect the verdict was reasonable. Even if the State's argument can be described as being misleading, *see Deck v. Jenkins*, 814 F.3d 954, 977-78 (9th Cir. 2016), the State immediately and accurately thereafter gave the definition of reasonable doubt. (*See* ECF No. 30-1 at 5 (reasonable doubt jury instruction).) Thus, it cannot be determined that the State's previous, isolated comment "had [a] substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637-38; *see generally United States v. Williams*, 690 F.3d 70 (2d Cir. 2012) (determining that the prosecutor's comment that "'this is not a search for reasonable doubt. This is a search for truth" was improper but not plain error). Therefore, because the Nevada Supreme Court reasonably denied that there was prosecutorial misconduct warranting the granting of relief to Reberger, Reberger is denied federal habeas relief for Ground Five, Subpart C.

///

///

### 4.  Subpart D

In Ground Five, Subpart D, Reberger alleges that his federal constitutional rights were violated when the State deliberately withheld important discovery material related to letters Reberger allegedly wrote from the Coos Bay Correctional Center. (ECF No. 6 at 74.) Specifically, Reberger alleges that the State misled him into believing that the original letters were destroyed and ambushed him at trial with the letter logs obtained from the Coos Bay Correctional Center. (*Id.* at 75.)

As was discussed briefly in Ground One and is discussed further in Ground Nine, Subpart E, Reberger wrote Harvey three letters from the Coos County Corrections facility. (ECF Nos. 18-9, 18-10, 19.) At a pre-trial hearing, Reberger's trial counsel indicated that the original letters "are no longer in existence." (ECF No. 23-17 at 4.) Reberger's trial counsel explained that he was "advised . . . that someone in the law enforcement chain . . . took the letters and gave them to Amber Lynn Harvey, who sent them to her mother, who threw them away." (*Id.* at 5.) The State confirmed that Coos Bay Correction Facility officers "made photocopies of letters, and they passed on the originals to Amber Harvey. And they made photocopies of the copies to send them down to Henderson. And of course these are the letters that everybody has here in Court." (*Id.* at 12.) The State also confirmed that he "spoke with Amber Harvey's mother a week ago, and [he] asked her where the originals were," and because "Amber basically wanted to have nothing else to do with Lance Reberger," the original letters were disposed of. (*Id.* at 12-13.)

Later, during the first trial, Reberger's trial counsel explained that, "all of a sudden, the originals [of the letters] are sitting here[.] . . . I don't now [sic] how they came from the dead, but we weren't advised that somehow they miraculously appeared." (ECF No. 26-1 at 46.) Reberger's trial counsel explained that they had "a Xerox copy of a Xerox copy" and that Reberger was prejudiced by the late introduction of the original

documents because Reberger did not have "a chance to challenge the validity of the chain of custody or the authorship of the letters."[6] (*Id.* at 48-49.)

Turning to Reberger's second contention, during the second trial, the State called Officer Jackson, who testified, among other things, about the mail procedures in the Coos County Corrections facility. (ECF No. 29 at 4, 10.) The State asked Officer Jackson about a log of the letters that Reberger sent while he was housed at the Coos County Corrections facility. (*Id.* at 11, 15.) Officer Jackson testified that the log, which was four pages in length, showed how many letters Reberger mailed and to whom the letters were sent. (*Id.* at 15.) When the State moved to admit the log, Reberger's trial counsel explained that he had "never seen [the log] until a couple minutes ago" and requested that he be able to ask Officer Jackson some questions about it. (*Id.* at 16.) During Reberger's trial counsel's questions, Officer Jackson testified that the log indicated whether mail is "inter-jail correspondence," does not state who in the jail the mail was sent to, and does not state when people receive mail. (*Id.* at 16-17.) Reberger's trial counsel than objected to the admission of the log on the basis that Officer Jackson was "not the custodian of records, he's not the person that can verify whether or not the information contained in those logs is proper or what procedures [were] used." (*Id.* at 26.) The state district court admitted the log over Reberger's trial counsel's objection. (*Id.* at 27.) Later, outside the presence of the jury, Reberger's trial counsel explained that "Andrew Jackson [came] in with logs that [he] didn't know existed and never had an opportunity to review." (*Id.* at 49.) The State indicated that it just saw the log that day and that it told Officer Jackson to bring them. (*Id.*) The state district court then stated that it did not "think those documents were so prejudicial," but warned the State that if it "told [Officer Jackson] to bring them and [it] was going to introduce them, it's encumbent [sic] upon [the State] to let [the defense] know." (*Id.* at 50.)

---

[6]The Court notes that the State had the original letters tested for fingerprints. (ECF No. 26-1 at 42-43.)

The Nevada Supreme Court reasonably concluded that the late notice of the original letters and the log of letters did not materially affect the verdict in Reberger's case. *See Brecht*, 507 U.S. at 637-38. First, although it is unclear when the State obtained the original letters, it explained that it did not originally have access to them. However, because notice of the original letters was given during the first trial, which ended in a mistrial, Reberger had knowledge of them prior to the commencement of the second trial. Regarding the log, it does not appear that the log contained any pertinent information that Reberger's trial counsel did not already know from the copies of the underlying letters contained in the log. Accordingly, because the Nevada Supreme Court reasonably rejected Reberger's prosecutorial misconduct claim, Reberger is denied federal habeas relief for Ground Five, Subpart D.

Because Reberger has failed to demonstrate that the foregoing instances of alleged prosecutorial misconduct warrant the granting of federal habeas relief, the cumulative effect of the alleged prosecutorial misconduct does not warrant the granting of federal habeas relief.

### D.    Ground Six

In Ground Six, Reberger alleges that his federal constitutional rights were violated when Harvey was allowed to testify even though she was incompetent. (ECF No. 65 at 76.) Secondly, Reberger asserts that there was a lack of independent corroboration regarding Harvey's testimony. (*Id.* at 78.)

Regarding the first part of Ground Six, incompetence, in Reberger's appeal of his judgment of conviction, the Nevada Supreme Court held: "Reberger appeals, arguing that the district court erred in numerous respects. We remain unpersuaded by Reberger's arguments because . . . Reberger produced no credible evidence . . . demonstrat[ing] why jurors could not properly determine the veracity of his co-defendant's testimony." (ECF No. 32-1 at 2.) This Court previously dismissed Respondents' argument that Reberger failed to rely on federal constitutional provisions

in his direct appeal, so this Court found this portion of Ground Six to be exhausted. (ECF No. 94 at 6.)

Regarding the second part of Ground Six, corroboration, in Reberger's appeal of his judgment of conviction, the Nevada Supreme Court held: "We remain unpersuaded by Reberger's argument[ that the district court erred] because . . . evidence independent of testimony rendered by Reberger's co-defendant . . . connected Reberger to the crimes, *see D'Agostino v. State*, 107 Nev. 1001, 823 P.2d 283 (1991)." (ECF No. 32-1 at 2.) Reberger also raised this claim in his appeal of the denial of his first state habeas petition, but the Nevada Supreme Court stated that the claim was barred by the doctrine of the law of the case because it had already held on direct appeal that the claim lacked merit. (ECF No. 38-9 at 8-9 & n.4.) In response to Respondents' contention in the motion to dismiss that Reberger raised this claim as a state-law claim only on direct appeal, this Court held that the Nevada Supreme Court implicitly considered the federal claims in the appeal of the denial of the state postconviction petition. (ECF No. 94 at 4.) As the Nevada Supreme Court only implicitly considered the federal claims, the question here is whether Reberger has shown that there was no reasonable basis for the Nevada Supreme Court to deny relief. *See Harrington*, 562 U.S. at 98 ("Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief.").

Prior to his trial, Reberger moved to limit Harvey's testimony. (ECF No. 23-7.) A hearing on the motion was held on November 20, 1992, wherein the state district court indicated that it "think[s] there is a lot of circumstantial evidence that [Reberger is] involved, but [it] need[s] something to connect him to the crime." (ECF No. 23-11 at 16.) The state district court then indicated that it would reserve ruling on the issue. (*Id.* at 23.) A second hearing on the motion was held on December 3, 1992, and again, the state district court "h[e]ld a ruling on this issue in abeyance" because it wanted "to see how the case goes." (ECF No. 23-14 at 17.) A third hearing on the motion was held on December 9, 1992, and at this time the state district court denied "[t]he motion to limit

the testimony of Amber Lynn Harvey." (ECF No. 23-17 at 17.) The state district court explained that "[t]here is a whole composite of facts and circumstances established by a number of witnesses that the accused was linked to the accomplice by association, motive, opportunity, knowledge. The whole gambit of their relationship is enough." (*Id.*) The state district court also explained, "it doesn't have to be enough to prove guilt; the slightest evidence that tends to connect. And I believe, based upon what the State says, they can prove that's sufficient." (*Id.*)

Reberger first takes issue with Harvey's testimony because she was on drugs, including heroin, crank, marijuana, and alcohol, when the crimes were committed. (ECF No. 29-2 at 67, 70.) Further, Harvey was taking Thorazine when she testified at Reberger's trial. (*Id.* at 67) Jack Jurasky, a physician and psychiatrist, testified that "Thorazine is a very powerful antipsychotic" drug. (ECF No. 30-2 at 11-13.)

Next, Reberger takes issue with Harvey's testimony because of her cognitive abilities. Harvey testified that she "ha[s] a little retardness [sic] in [her]." (ECF No. 29-2 at 69.) And Lewis Marvin Etcoff, a licensed psychologist and a clinical neuropsychologist, testified that he met with Harvey and determined that "[h]er intelligence test score, her verbal intelligence, came out to an I.Q. of 68, which falls in the mildly mentally retarded range." (ECF No. 30-2 at 16-18.) Dr. Etcoff explained that he "wasn't convinced that [Harvey] was relating the facts to [him] as they actually occurred. [He] wasn't sure that [Harvey] was able to or even remembered exactly what occurred, because she seemed to have changed her story several times from the information that [he] had been provided." (*Id.* at 18.) Dr. Etcoff explained that he thought Harvey was "confused and mixed up, which would probably account for her telling different stories at different times to different people." (*Id.* at 26.)

Third, Reberger takes issue with Harvey's testimony because she told inconsistent stories. Harvey testified that she believed she told Coos Bay law enforcement that she had never seen the gun before and that "the only reason [she] went along was because Lance put a gun up against [her] son's head." (ECF No. 29-2

at 57-58.) Harvey admitted that this was not true and that she lied because she was scared, had not slept for days, was sick, was pregnant and was on drugs. (*Id.* at 30, 57.) Later, in a statement to the Henderson Police Department, Harvey said that she heard two muffled shots when she was in the vehicle, saw somebody dressed all in black, and had possession of the gun. (*Id.* at 61-62, 66.) Harvey later told an inmate that she did not have anything to do with the crimes in question. (*Id.* at 57.) Finally, in her interview with the Department of Parole and Probation, Harvey said she "only provided an interview to the police because they threatened [her] with rape" and that "she had no memory of the instant offense, the actual crime." (*Id.* at 88; *see also* ECF No. 29-4 at 12.) However, in her written statement given to Joy Mundy-Neal, the Department of Parole and Probation officer who wrote Harvey's presentence investigation report, Harvey wrote the following: "I know I was wrong doing a burglary, but I swear on my life, I did not know about the robbery and murder." (*Id.* at 23.)

Similar to Ground Four, there was a question about Harvey's competence and whether, under Nevada law, there was corroborating evidence supporting Harvey's testimony. *See LaPena v. Sheriff*, 91 Nev. 692, 694, 541 P.2d 907, 909 (1975) (explaining that Nevada law "prohibits a conviction on testimony of an accomplice unless he is corroborated"). However, in order to prevail on a federal habeas claim, Reberger must demonstrate that Harvey's "testimony is almost entirely unreliable and that the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings." *Barefoot*, 463 U.S. at 899, *superseded on other grounds by* 28 U.S.C. § 2253(c)(2). Here, the jury was aware that Harvey was on drugs when the crimes occurred, was on medication while testifying at Reberger's trial, had limited cognitive abilities, and told previous inconsistent stories. Further, as was also pointed out in Ground Four, the jury was instructed about credibility and believability of a witness. (ECF No. 30-1 at 11.) Because the jury was aware of the potential shortcomings of Harvey's testimony and was able to weigh Harvey's credibility in light of these shortcomings, the Nevada Supreme Court reasonably concluded that Reberger

failed to demonstrate why the jury could not determine Harvey's veracity. Accordingly, it cannot be concluded that Reberger's trial was rendered fundamentally unfair due to Harvey's alleged incompetence. *McGuire*, 502 U.S. at 67.

Further, regarding the corroboration issue, it is Reberger's burden to demonstrate a lack of congruence with United States Supreme Court precedent. Reberger only cites case law regarding sufficiency of the evidence; however, he fails to cite any apposite constitutional decisions by the Supreme Court regarding corroborating evidence. Reberger has failed to show that there was no reasonable basis for the Nevada Supreme Court to deny relief. *See Harrington*, 562 U.S. at 98.

Reberger is denied federal habeas relief for Ground Six.

### E.    Ground Seven

In Ground Seven, Reberger alleges that his federal constitutional rights were violated when the jury engaged in premature deliberations. (ECF No. 65 at 81.) Reberger elaborates that the state district court should have engaged in further inquiry after being informed that some jurors were discussing the case prematurely. (*Id.*) In Reberger's appeal of his judgment of conviction, the Nevada Supreme Court held: "Reberger appeals, arguing that the district court erred in numerous respects. We remain unpersuaded by Reberger's arguments because . . . Reberger produced no credible evidence of prejudicial juror misconduct." (ECF No. 32-1 at 2.)

On January 20, 1993, Deanna Domingo was called as a witness for the defense at Reberger's trial. (ECF No. 29-3 at 3, 27.) The following day, January 21, 1993, outside the presence of the jury, Reberger's trial counsel informed the state district court that "Miss Domingo, who testified yesterday, apparently contacted [Reberger] yesterday and advised him that when she was downstairs, she overheard the jury talking about how they felt sorry for Amber and were upset at what Lance might have put Amber through." (ECF No. 29-5 at 5.) The state district court replied that it "d[id]n't know if that's true or what," and indicated, in response to Reberger's trial counsel suggesting that an inquiry

could be made of Domingo, it was "not going to do anything. You can if you think there is a problem, but [it] didn't see any." (*Id.*)

Reberger's trial counsel later insisted on making a record of Domingo's observations regarding the jury. (*Id.* at 36.) Domingo testified outside the presence of the jury that as she was walking alongside a couple of people in the courthouse, she heard them say, "'Lance is taking it pretty good.' And another girl said, 'I kind of felt sorry for the girl.'" (*Id.* at 37.) A little while later, after the lunchbreak, Domingo recognized the people she heard speaking sitting as jurors in Reberger's trial. (*Id.*) During cross-examination, Domingo testified that she told Reberger this information when he called her the night before. (*Id.* at 38.) Domingo also explained that she had visited Reberger in jail approximately twenty-five times. (*Id.* at 39.) The state district court then ruled on the issue:

> I don't know if she's talking about our jury or what they were talking about. There are two juries, two or three juries, out there. Two of them are outside our courtroom. There's one outside our courtroom that's not even our jury who's been sitting around here.
>
> She didn't identify who the people were. I have no idea what she's talking about. And if they're even jurors, or if they were our jurors, or if they were witnesses or - - I don't even know. She wasn't very clear about when and where and what, who or anything.
>
> The Court will admonish the jury not to discuss this case again. But I think I've done that, and I don't have any credible evidence that they've been doing otherwise.

(*Id.* at 40.)

The Supreme Court has explained that "due process does not require a new trial every time a juror has been placed in a potentially compromising situation," rather, due process guarantees "a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). If juror misconduct is alleged, "the remedy . . . is a hearing in which the defendant has the opportunity to prove actual bias." *Id.* at 215. Following that hearing,

the court must assess "whether or not the misconduct has prejudiced the defendant to the extent that he has not received a fair trial." *United States v. Klee*, 494 F.2d 394, 396 (9th Cir. 1974).

Reberger was given an "opportunity to prove actual bias," *Smith*, 455 U.S. at 215, by having Domingo testify about her observations. Thereafter, the state district court concluded that Domingo was not credible and, as such, no action was warranted beyond further admonishment of the jury. (ECF No. 29-5 at 40.) The relationship between Reberger and Domingo supports the state district court's credibility determination. *See generally Rice v. Collins*, 546 U.S. 333, 341-42 (2006) ("Reasonable minds reviewing the record might disagree about the prosecutor's credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination."). Indeed, Domingo testified that she had visited Reberger in jail approximately twenty-five times and had spoken to him on the telephone the evening that she allegedly observed the jury members conversing. (ECF No. 29-5 at 38-39.) Accordingly, the Nevada Supreme Court's conclusion that Reberger failed to produce sufficient support that a prejudicial occurrence took place was reasonable. *See Smith*, 455 U.S. at 217. Because Reberger fails to show a violation of his federal constitutional rights, he is denied federal habeas relief for Ground Seven.

## F. Ground Eight

In Ground Eight, Reberger argues that his federal constitutional rights were violated when the state district court refused to give two proposed jury instructions which were based on his theory of defense. (ECF No. 65 at 82.) In Reberger's appeal of his judgment of conviction, the Nevada Supreme Court held that "the district court adequately instructed the jury regarding Reberger's theory of the case." (ECF No. 32-1 at 2.) As with Ground Four and Six, Reberger also raised this claim in his appeal of the denial of his first state habeas petition, but the Nevada Supreme Court stated that the claim was barred by the doctrine of the law of the case because it had already held on direct appeal that the claim lacked merit. (ECF No. 38-9 at 9 & n.4.) In response to

Respondents' contention in the motion to dismiss that Reberger raised this claim as a state-law claim only on direct appeal, this Court held that the Nevada Supreme Court implicitly considered the federal claims in the appeal of the denial of the state postconviction petition. (ECF No. 94 at 4.) As the Nevada Supreme Court only implicitly considered the federal claims, the question here is whether Reberger has shown that there was no reasonable basis for the Nevada Supreme Court to deny relief. *See Harrington*, 562 U.S. at 98 ("Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief.").

Issues relating to jury instructions are not cognizable in federal habeas corpus unless they violate due process. *See Estelle v. McGuire,* 502 U.S. 62, 72 (1991); *see also Gilmore v. Taylor*, 508 U.S. 333, 342 (1993) ("[W]e have never said that the possibility of a jury misapplying state law gives rise to federal constitutional error."). The question is "'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process', . . . not merely whether 'the instruction is undesirable, erroneous, or even universally condemned.'" *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (quoting *Cupp v. Naughten*, 414 U.S. 141, 146-47 (1973)). A challenged instruction "'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." *Estelle*, 502 U.S. at 72 (quoting *Cupp*, 414 U.S. at 147); *see also United States v. Frega*, 179 F.3d 793, 806 n.16 (9th Cir. 1999) (explaining that a court inquires as to "whether the instructions as a whole are misleading or inadequate to guide the jury's deliberation" (internal citations omitted)). Furthermore, jurors are presumed to follow the instructions that they are given. *See United States v. Olano*, 507 U.S. 725, 740 (1993). Even if an instruction contains a constitutional errors, the court must then "apply the harmless-error analysis mandated by *Brecht*[ *v. Abrahamson*, 507 U.S. 619 (1993)]." *Calderon v. Coleman,* 525 U.S. 141, 146 (1998). The question is whether the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 145.

The heart of Reberger's argument is that the district court prevented him from establishing his defense theory by denying his proposed instructions. *See Mathews v. United States*, 485 U.S. 58, 63 (1988) ("As a general proposition a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor."). Reberger's trial counsel proposed two jury instructions. (ECF No. 30-2 at 38.) The first proposed instruction provided that "the State has introduced evidence which was discovered approximately two years after the crime was committed. In deciding what weight to give this evidence, you must consider the time which has passed between the date the crime was committed and the date the evidence was discovered." (*Id.* at 38-39.) The second proposed instruction provided that "the jury has little knowledge as to the type of pressures and inducement that the jail inmates are under to cooperate with the State and to say anything that is helpful to the State's case. Therefore, such testimony should be carefully evaluated." (*Id.* at 39.)

Reberger's trial counsel explained that "[t]he Court refused [his second proposed] instruction. However, we compromised on an instruction which is now Number 12." (*Id.*) Following comment from the State, the state district court explained:

> The Court - - in regards to Defense Instruction Number B, the Court declined to give that instruction because the Court did not feel that it was - - the Court did not approve of the way it was written. The Court thought it was confusing and that it was not the law, per se.
>
> However, the Court did find an instruction - - we fashioned one which would take care of the problems that the defense wanted to cure, and that is having a jailhouse person come into court and testify to the admission that was made by the defendant and that his testimony should be looked at with caution and with great scrutiny.
>
> The Court felt that Instruction Number 12 would alleviate concerns that our Supreme Court expressed in the D'Agostino case. And also the Court would note that the instruction that the defense proposed came out of D'Agostino, which specifically went to the penalty phase of the hearing and not to the guilt phase. And the Court thinks Instruction Number 12 states what the defense wanted to state about the witness who was in custody.
>
> In reference to defense Instruction Number 8, basically the Court found this instruction to be consuming also. I mean, I don't know what the - - it's just a

statement that the case - - some evidence was found two years after the crime was committed; and that they must consider the time between the time that the crime happened and when the evidence was submitted. I don't know. That's not stating any law, and it just made one blanket statement. Of course, in a murder case sometimes it's 20 years before evidence is discovered, in order to convict a person for murder. There is no statute of limitations on murder and on the evidence that can be used.

Therefore, that's why the Court gave this instruction, although you can always argue weight and inferences to be drawn from any evidence. And that's your prerogative during closing argument. The Court is not going to foreclose that to you. However, the Court doesn't think it's proper in a jury instruction.

(*Id.* at 40-41.)

Turning first to Reberger's proposed jury instruction about later-discovered evidence, this proposed instruction regarded Harvey taking law enforcement to the desert "[t]o show them the stuff that [Harvey and Reberger had] ditched," which occurred "a couple months" before Reberger's trial. (*See* ECF No. 29-2 at 30; *see also* ECF No. 23-25.) Reberger's proposed instruction was based on *Bishop v. State*, which explained that the passage of time between the crime and the discovery of evidence "goes to the weight rather than the admissibility" of that evidence. 554 P.2d 266, 273 (Nev. 1976). Although the jurors were not instructed about consideration of later-discovered evidence specifically, they were instructed about the consideration of evidence generally. (*See* ECF No. 30-1 at 6 ("Although you are to consider only the evidence in the case in reaching a verdict, you must bring to the consideration of the evidence [their] everyday common sense and judgment as reasonable men and women.").) Because the jury was instructed to use their common sense and judgment in considering the evidence against Reberger, the jury was adequately instructed about Reberger's defense theory that the evidence was unreliable. *See Mathews*, 485 U.S. at 63. Therefore, because Reberger fails to demonstrate a due process violation, *Estelle,* 502 U.S. at 72, Reberger has failed to show that there was no reasonable basis for the Nevada Supreme Court to deny relief. *Harrington*, 562 U.S. at 98.

38

Turning to Reberger's proposed instruction about evaluating inmate testimony, Reberger cites to *D'Agostino v. State*, which provided that "[a] legally unsophisticated jury has little knowledge as to the types of pressures and inducements that jail inmates are under to 'cooperate' with the state and to say anything that is 'helpful' to the state's case." 823 P.2d 283, 284 (Nev. 1991). Reberger's proposed jury instruction copies this language from *D'Agostino* and then adds that "such testimony should be carefully evaluated." (ECF No. 30-2 at 39.) Instead of Reberger's proposed instruction, the state district court instructed the jury as follows: "You have heard testimony that the Defendant made an oral admission to a person in custody. Evidence of an oral admission by a Defendant ought to be viewed with caution." (ECF No. 30-1 at 13.) Although the jury was not instructed about the pressures an inmate is under to cooperate, which is more akin to argument, the jury was instructed about the careful evaluation that ought to be given to inmate testimony, which was the basis of Reberger's proposed instruction and defense regarding inmate testimony. Accordingly, the jury was adequately instructed about Reberger's defense theory, *see Mathews*, 485 U.S. at 63, such that Reberger fails to demonstrate a due process violation, *see Estelle,* 502 U.S. at 72, and fails to show that there was no reasonable basis for the Nevada Supreme Court to deny relief, *see Harrington*, 562 U.S. at 98.

Reberger is denied federal habeas relief for Ground Eight.

### G.    Ground Nine

In Ground Nine, Reberger alleges that his federal constitutional rights were violated due to eight instances of ineffective assistance of his trial counsel. (ECF No. 65 at 83-93.) In *Strickland*, the Supreme Court propounded a two-prong test for analysis of claims of ineffective assistance of counsel requiring the petitioner to demonstrate (1) that the attorney's "representation fell below an objective standard of reasonableness," and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668,

688, 694 (1984). A court considering a claim of ineffective assistance of counsel must apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The petitioner's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. Additionally, to establish prejudice under *Strickland,* it is not enough for the habeas petitioner "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

Where a state district court previously adjudicated the claim of ineffective assistance of counsel under *Strickland*, establishing that the decision was unreasonable is especially difficult. *See Harrington*, 562 U.S. at 104-05. In *Harrington*, the United States Supreme Court instructed:

> The standards created by *Strickland* and § 2254(d) are both "highly deferential," [*Strickland*, 466 U.S. at 689]; *Lindh v. Murphy*, 521 U.S. 320, 333, n.7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles* [*v. Mirzayance*, 556 U.S. 111, 123 (2009)]. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at 123, 129 S.Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonably argument that counsel satisfied *Strickland*'s deferential standard.

*Harrington*, 562 U.S. at 105; *see also Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (internal quotation marks omitted) ("When a federal court reviews a state court's *Strickland* determination under AEDPA, both AEDPA and *Strickland*'s deferential standards apply; hence, the Supreme Court's description of the standard as doubly deferential.").

### 1.  Subpart A

In Ground Nine, Subpart A, Reberger argues that his trial counsel erred in failing to call Corrine Kemp to testify. (ECF No. 65 at 84.) Reberger explains that Kemp, the

girlfriend of jailhouse informant Dean Salvador Zuniga, would have undermined Zuniga's testimony. (*Id.* at 84-85.) In Reberger's appeal of the denial of his first state habeas petition, the Nevada Supreme Court held:

> [A]ppellant claimed counsel were ineffective for failing to call C. Kemp as a witness to impeach the credibility of the jailhouse informant. Appellant failed to demonstrate deficiency or prejudice. Kemp testified at the evidentiary hearing that she arrived at the courthouse too late to testify, was high on heroin when she arrived, and would not have gone into the courtroom so "loaded." We therefore conclude that the district court did not err in denying this claim.

(ECF No. 38-9 at 3.)

As was explained in Ground Four, Zuniga, Reberger's former cellmate, testified at Reberger's trial that Reberger had told him that "he capped" someone. (ECF No. 29-1 at 43-45.) Kemp, who had previously been in a relationship with Zuniga and had a son with him, testified at the post-conviction evidentiary hearing that Zuniga told her approximately two months prior to Reberger's trial that Zuniga "did not . . . know that Lance killed that kid" and that "he didn't know that that's what [he] did or that's what [he was] in there for." (ECF No. 34 at 51, 61-62, 72.) Kemp was "never called to [Reberger's] trial in 1993" because she "was doing illegal activity, . . . was on drugs and . . . didn't show up for court." (*Id.* at 53-55.) In fact, Kemp testified that she went to the courthouse during Reberger's trial "because [she] was told that they brang [sic] Dean down for court. So, [she] was going to go to court and tell them that Dean was lying." (*Id.* at 57.) However, Kemp testified that she was using heroin and PCP during that time and missed Zuniga's testimony. (*Id.* at 58, 67.) Later, after Reberger's trial, Kemp wrote Reberger a letter telling Reberger "that [Zuniga] was lying." (*Id.* at 58, 61; *see also* ECF No. 39-1 (Kemp's letter to Reberger in which she states "if I can get sapenad [sic] [and] test a fi [sic] in your appeal that Dino lied[,] I will do it").) Kemp believed that Zuniga "was testifying against [Reberger] to get out of prison." (ECF No. 34 at 63.)

Kemp explained that she was contacted by Reberger's trial counsel prior to his trial. (*Id.* at 53.) "[A] detective that was helping Lance" came to her house, and Kemp

spoke to him more than once. (*Id.* at 66, 68.) On one occasion, Reberger's "investigator put a tape recorder in [her] baby's crib so [they] could catch the conversation between the DA's office and [Kemp]." (*Id.*; *see also* ECF No. 23-23 (transcript of Officer White's conversation with Kemp at Kemp's home).) Kemp testified that she "probably" told Reberger's investigator what Zuniga had told her regarding being unaware of Reberger's crime, but she did not recall whether she told the investigator whether she had prior felony convictions. (ECF No. 34 at 67, 73.)

Trial "counsel has a duty to make reasonable investigations." *Strickland*, 466 U.S. at 691. Reberger's trial counsel satisfied this requirement, as they sent an investigator to speak with Kemp on several occasions prior to the trial. (ECF No. 34 at 66, 68.) Even if Kemp could have discredited Zuniga's statement that Reberger told him that he "capped" someone (ECF No. 29-1 at 45), that does not lead to a conclusion that Reberger's trial counsel were deficient in not calling Kemp as a witness. *See Strickland*, 466 U.S. at 688. Kemp was using several illegal drugs around the time of Reberger's trial and had prior felony convictions. (ECF No. 34 at 53-55, 67.) Accordingly, refraining from calling Kemp as witness may have been strategic, such that the Nevada Supreme Court reasonably concluded that Reberger failed to demonstrate deficiency. *See Strickland*, 466 U.S. at 688. And even if Reberger's trial counsel was deficient, the Nevada Supreme Court also reasonably concluded that Reberger could not demonstrate prejudice. *See id.* at 694. Kemp's drug use and prior convictions cast doubt on her credibility, and Zuniga's testimony was already questionable without further impeachment evidence from Kemp. In fact, Zuniga testified at the trial that Detective White told him that he would "speak on [Zuniga's] behalf" via a letter to the parole board if Zuniga testified against Reberger. (ECF No. 29-1 at 46.)

Reberger is denied federal habeas relief for Ground Nine, Subpart A.

///

///

///

## 2. Subpart B

In Ground Nine, Subpart B, Reberger argues that his trial counsel failed to investigate and call two alibi witnesses. (ECF No. 65 at 85.) In Reberger's appeal of the denial of his first state habeas petition, the Nevada Supreme Court held:

> [A]ppellant claimed counsel were ineffective for failing to locate and call at trial two alibi witnesses. Appellant failed to demonstrate deficiency or prejudice. At the evidentiary hearing on the instant petition, counsel testified and appellant presented a report demonstrating that defense investigators attempted to locate the alibi witnesses. Counsel further testified that they did not call any alibi witness because appellant had confessed to the crimes and counsel would not suborn perjury. We therefore conclude that the district court did not err in denying this claim.

(ECF No. 38-9 at 3.)

On December 9, 1991, a report was issued by Louis Smit, the Director of Investigations at Selgae Associates. (ECF No. 39-10.) On the request of Dunleavy, Smit interviewed Reberger, who provided two individuals who he believed "may provide an alibi for his whereabouts on or about November 4, 1990" because "he believed he was in the Skyline Casino" at the time the crime was committed. (*Id.* at 2.) After contacting the Skyline Casino, Smit learned the name of one of the potential witnesses, Heidi Hubbard, and her contact information. (*Id.* at 3.) Smit concluded his report by indicating that "[f]urther follow-up and contact of these individuals will be suspended until there is a further conference between myself and Attorney Philip Dunleavy." (*Id.* at 5.)

After the case was submitted to the jury for deliberation, the state district court allowed Reberger the opportunity to lodge "any objections he may have to the defense counsel as to the manner in which defense counsel . . . conducted his defense." (ECF No. 30-3 at 58-59.) Reberger explained that he had "two alibis in this case. But unfortunately when it was investigated, went to the Skyline Casino where I was at the time, the two change girls that were there were nowhere to be found." (*Id.* at 62.) In response, Dunleavy called Steven Jensen, an investigator with Selgae Associates, to testify. (*Id.* at 63-64.) Jensen testified that he "went to the Skyline Casino and talked to

the change manager," however, "[n]o one there knew anybody with [the given] description or [given first] name that worked about approximately that time." (*Id.* at 64.)

Dunleavy's co-counsel, Patrick McDonald, Esq. testified years later at the post-conviction evidentiary hearing that he did not remember seeing Smit's report. (ECF No. 36-2 at 60, 73; ECF No. 34-1 at 217.) And Dunleavy testified that his investigator "found a potential alibi witness," but Dunleavy did not call her to testify because she was not credible and would have lied. (ECF No. 34 at 85, 124.) Dunleavy elaborated that Reberger told him "on multiple occasions" that he "was at the scene of the crime" and told Dunleavy he committed the crime. (*Id.* at 125.) Therefore, Dunleavy refused to call Hubbard to testify because she would have committed perjury "if she said [Reberger was] at the casino at the time of the crime." (*Id.*) Reberger refuted Dunleavy's testimony when he testified at the post-conviction evidentiary hearing that "Dunleavy lied when claiming [he] allegedly confessed to this crime." (ECF No. 37-1 at 122, 125.) Reberger explained that "Dunleavy failed to interview one of my alibi witnesses, Heidi Hubbard . . . , when her address was provided to Mr. Dunleavy" and his "two alibi witnesses would have put [him] at Skyline Casino at the time of this crime." (*Id.* at 132.)

Although it appears that Jensen's testimony during Reberger's trial was erroneous because Smit's report clearly stated that he had obtained Hubbard's name and contact information, the Nevada Supreme Court reasonably concluded that Reberger's trial counsel was not deficient for failing to investigate and call Hubbard or another Skyline Casino employee to testify. *See Strickland*, 466 U.S. at 688. Dunleavy refrained from calling an alibi witness because Reberger had previously confessed to committing the crimes to him, so Dunleavy was prevented from presenting false information. *See Nix v. Whiteside*, 475 U.S. 157, 173 (1986) ("[T]he right to counsel includes no right to have a lawyer who will cooperate with planned perjury."). Further, the Nevada Supreme Court reasonably concluded that Reberger failed to establish prejudice because it is unclear what either of Reberger's two alleged alibi witnesses' testimony would have been. *See Strickland*, 466 U.S. at 694. It is mere speculation that

they would have testified that Reberger was at the Skyline Casino on November 4, 1990. *See Djerf v. Ryan*, 931 F.3d 870, 881 (9th Cir. 2019) ("*Strickland* prejudice is not established by mere speculation."). Because the Nevada Supreme Court reasonably concluded that Reberger's ineffective assistance of counsel claim was meritless, Reberger is denied federal habeas relief for Ground Nine, Subpart B.

### 3. Subpart C

In Ground Nine, Subpart C, Reberger argues that his trial counsel improperly waived his speedy trial rights because the State was able to build a stronger case against him after the sixty-day time period had expired. (ECF No. 65 at 86.) In Reberger's appeal of the denial of his first state habeas petition, the Nevada Supreme Court held:

> [A]ppellant claimed counsel were ineffective for waiving his right to a speedy trial without discussing it with him. Appellant failed to demonstrate deficiency. Counsel testified at the evidentiary hearing that they did discuss appellant's right, how counsel could not be ready in 60 days, and that appellant agreed to waive the right. We therefore conclude that the district court did not err in denying this claim.

(ECF No. 38-9 at 4.)

At Reberger's arraignment on March 3, 1992, his trial counsel "waive[d] the 60-day [r]ule." (ECF No. 22-10 at 4.) Reberger's first trial commenced later that year on December 29, 1992. (ECF No. 24-1 at 2.) Years later at the post-conviction evidentiary hearing held in 2010, Reberger testified that he "specifically told Mr. Dunleavy [he] wanted to invoke [his] 60-day right to a speedy trial rule." (ECF No. 37-1 at 122.) Reberger elaborated that he "specifically told Mr. Dunleavy . . . that [he] wanted to go to trial as soon as possible" since he "knew the prosecution had no case on [him], and [he] knew [he] did not commit this crime. And [he] didn't want to stay in jail for a crime [he] did not commit." (*Id.*) Reberger explained that "Mr. Dunleavy . . . waived [his] right to a speedy trial to allow the prosecution to gather as much evidence as possible before he took [Reberger] to trial to make sure [Reberger] would be convicted," and "Mr. McDonald agreed with Mr. Dunleavy's decision on waiving [Reberger's] 60 day rule right to a

speedy trial because he also wanted [Reberger] to go to trial and help the prosecution convict [him]." (*Id.* at 123.)

Dunleavy's testimony at the post-conviction evidentiary hearing contradicted Reberger's testimony. Dunleavy explained that he and McDonald "talked to [Reberger] repeatedly about the need to actually prepare to do an investigation and that if [Reberger] insisted on the 60-day speedy trial rule, [trial counsel] may not be able to get it all done." (ECF No. 34 at 86, 117.) After speaking with Reberger "at least twice" about waiving the 60-day rule, "[Reberger] specifically told [Dunleavy and McDonald that he] wanted to waive [his] speedy trial and have [trial counsel] prepare." (*Id.* at 117-118.) In those discussions, Dunleavy and Reberger "talked about the need in a capital case to do a thorough preparation and that it's impossible to properly prepare a capital case in 60 days. It usually takes over a year." (*Id.* at 121.) Dunleavy also explained that "almost all defense cases get better with age" and that Reberger's case "is the only case [Dunleavy] ever had where [the State] went out and found evidence like a year and a-half afterwards." (*Id.*) Similarly, McDonald testified at the post-conviction evidentiary hearing that he agreed with Dunleavy's decision to waive the 60-day rule because Reberger's case was complex. (ECF No. 36-2 at 60, 76-77.) However, McDonald explained that Reberger's case is "the only case [he had] seen . . . in 23 years" where evidence come out after the waiver of the 60-day rule. (*Id.* at 77.) McDonald testified that, in hindsight, it would have been better to have taken "the case to trial four months before Amber Harvey." (*Id.* at 78.)

Although the State obtained further evidence against Reberger after he waived his right to a trial within 60 days, that does not lead to a conclusion that Reberger's trial counsel acted deficiently in waiving that right. Indeed, Dunleavy and McDonald both explained that Reberger's case was the only case they had ever had where the State was able to obtain further evidence after the waiver. (*See* ECF No. 34 at 121; ECF No. 36-2 at 77.) Reberger's trial counsel were not deficient for failing to anticipate these rare, unfortunate, future circumstances. Further, contrary to Reberger's contentions and

testimony, Dunleavy testified that he spoke with Reberger about the waiver and that Reberger specifically authorized the waiver in order to give his trial counsel adequate time to prepare for his complex, capital case. (ECF No. 34 at 117-118.) Accordingly, the Nevada Supreme Court reasonably determined that Reberger failed to show deficiency on the part of his trial counsel. *See Strickland*, 466 U.S. at 688.

Reberger is denied federal habeas relief for Ground Nine, Subpart C.

### 4. Subpart D

In Ground Nine, Subpart D, Reberger argues that his trial counsel introduced incriminating evidence against him at the trial. (ECF No. 65 at 87.) Specifically, Reberger alleges that his trial counsel called the State's handwriting expert as a witness to testify about letters allegedly written to Reberger from Harvey; however, that testimony included the fact that the expert believed Reberger had altered the letters. (*Id.* at 87-88.) This error was allegedly compounded by Reberger's trial counsel later moving for the admission of the altered letters. (*Id.* at 87.) In Reberger's appeal of the denial of his first state habeas petition, the Nevada Supreme Court held:

> [A]ppellant claimed counsel were ineffective for failing to interview the State's handwriting expert prior to calling him as a defense witness. Appellant failed to demonstrate prejudice. The expert testified at trial that appellant likely changed one word in each of two letters written by the codefendant to appellant. Appellant failed to demonstrate that, but for this testimony, there was a reasonable probability of a different outcome at trial. The State's case against appellant was based primarily on the testimony of the codefendant, who had already been convicted and sentenced for the crime and had not been promised anything to induce her testimony, and was corroborated by appellant's own incriminating writings. We therefore conclude that the district court did not err in denying this claim.

(ECF No. 38-9 at 4-5.)

During Reberger's cross-examination of Harvey, Harvey answered in the affirmative when asked if she wrote letters to Reberger "wherein [she] said that [she] shot the man." (ECF No. 29-2 at 80.) In fact, Harvey explained that she wrote that information in a couple of letters to Reberger. (*Id.*) Following a discussion outside of the jury, Harvey's cross-examination continued wherein Harvey was asked whether she

wrote a specific letter which stated, "[t]hey know I shot that guy." (*Id.* at 80, 83-84.) Harvey responded that she "didn't put that in that letter then." (*Id.* at 84.) Harvey then clarified that she "didn't write none [sic] of those [letters] that said [she] shot anybody." (*Id.*) After admitting that the letter was in her handwriting, Harvey explained that she "didn't put those records in there." (*Id.* at 85.)

Later, during Reberger's case-in-chief, William Leaver, a document examiner with the Las Vegas Metropolitan Police Department, was called and asked if he was "provided with some letters last night and asked to look them over." (ECF No. 29-5 at 14; ECF No. 29-2 at 103.) Leaver responded in the affirmative and explained that he looked at several handwritten letters and envelopes from Harvey to Reberger. (ECF No. 29-5 at 14-15.) Although he could not confirm whether Harvey wrote the letters due to the lack of a comparison sample, Leaver found that "[t]here was common authorship, for the most part, with the exception of a few words in which a determination could not be made." (*Id.* at 16, 28.)

Leaver explained that in two of the handwritten letters, the "particular word, K-N-O-W, [was] dissimilar to the other writing[s]" on the pages. (*Id.* at 17, 20.) Leaver clarified, regarding the first letter, "there's been erasure, overwriting, retouching, resimulation of that word, K-N-O-W, and I believe it to be sufficiently dissimilar; that it was not written by the same person who wrote the remaining body of this letter." (*Id.* at 18.) Similarly, regarding the word "know" in the second letter, Leaver stated that "there is overwriting and retouching on that particular word. And it is dissimilar to the point that my opinion is it was not written by the same person that wrote the body of this particular document." (*Id.* at 20.) The full sentence from the first letter that contained the altered word "know," read, "'[t]hey know I shot that guy, because Bob had the weapon back, if you know what I mean.'" (*Id.* at 17-18.) And the full sentence from the second letter that contained the altered word "know," read, "'[y]ou will pay for this. You just got me life in prison, because they know I shot that guy. So you better start talking a little more than you are." (*Id.* at 21.) Leaver also testified that he believed that the "know" replaced the

word "think" in the first letter. (*Id.* at 33.) Because he had previously analyzed Reberger's writing in the examination of his letters, Leaver stated that "[t]here were similarities with [Reberger's writings], but [he could not] identify absolutely any other person as having" written the altered "know" in Harvey's two letters. (*Id.* at 18-19.) Reberger's trial counsel then moved for the admission of Harvey's letters into evidence. (*Id.* at 24.)

Dunleavy later testified at the post-conviction evidentiary hearing that Harvey's handwritten letters were used to impeach her direct examination testimony. (ECF No. 34-1 at 35, 175.) Dunleavy explained that Harvey admitted authoring the letter "wherein she admitted she shot the person," however, Harvey also indicated "that some of [the letter] had been changed." (*Id.* at 175.) Dunleavy testified that he and McDonald "did not know [the letters] had been doctored at the time" and that Reberger's alterations to the letters "[c]hanged the content" of the letters. (*Id.* at 177.)

Although Reberger's trial counsel may have been deficient in calling Leaver to testify about the letters without sufficiently questioning him beforehand about the possibility that the letters had been altered, especially in light of Harvey's previous testimony that they were altered, the Nevada Supreme Court reasonably determined that Reberger failed to demonstrate prejudice. *See Strickland*, 466 U.S. at 694; *see generally Crisp v. Duckworth*, 743 F.2d 580, 587 (7th Cir. 1984) (concluding that "[a]though [the defendant]'s contention [that his trial counsel elicited damaging testimony from a prosecution witness] has some merit, the snippet of testimony was not sufficiently damaging . . . to shake our confidence in the reliability of the jury's verdict"); *United States v. Gooch*, 842 F.3d 1274, 1279 (D.C. Cir. 2016) (concluding that no prejudice resulted from the defendant's trial counsel's open-ended question when cross-examining a police detective about why the defendant had ceased going to a particular area, which led the detective to respond "[b]ecause he shot the people" because this was a "fleeting remark" made during a month-long trial and the evidence of guilt was substantial). Indeed, as was discussed in Ground One and will be discussed in Ground Nine, Subpart E, Reberger wrote letters to Harvey stating, among other things, that

49

"[y]ou don't know how he died only I know how," and "[w]e fucked up, I am is [sic] good as dead[,] you will be out in 10 or 20 years if your [sic] lucky but not me[.] . . . we should have never done it in the first place now we are going to pay for it big time." (ECF No. 19 at 4; ECF No. 18-9 at 3.) This incriminating evidence demonstrates the reasonableness of the Nevada Supreme Court's holding that Reberger "failed to demonstrate that, but for [Leaver's] testimony, there was a reasonable probability of a different outcome at trial." (ECF No. 38-9 at 4-5.) Further, the jury was instructed that "[e]vidence that a defendant . . . tried to manufacture evidence . . . is not sufficient in itself to prove guilt and its weight and significance, if any, are matters for your determination." (ECF No. 30-1 at 12.) Accordingly, because the Nevada Supreme Court's rejection of Reberger's *Strickland* claim was reasonable, Reberger is denied federal habeas relief for Ground Nine, Subpart D.

### 5. Subpart E

In Ground Nine, Subpart E, Reberger argues that his trial counsel failed to sufficiently challenge the letters he wrote to Harvey. (ECF No. 65 at 88.) Specifically, Reberger argues that his trial counsel failed to contact an expert to refute that Reberger wrote the letters; failed to call those familiar with Reberger's handwriting to testify that, unlike the admitted letters, Reberger always wrote in cursive and used correct grammar; failed to challenge the chain of custody of the letters; and failed to seek suppression of the letters as derivative of the right to counsel violation. (*Id.* at 88-89.) In Reberger's appeal of the denial of his first state habeas petition, the Nevada Supreme Court held:

> [A]ppellant claimed counsel were ineffective for failing to call appellant's handwriting expert at trial to prove appellant did not write certain incriminating letters. Appellant failed to demonstrate deficiency or prejudice. Appellant failed to demonstrate that he had requested counsel to retain a specific handwriting expert or that the expert would have concluded that appellant did not author the letters. The expert that counsel did retain opined that appellant had authored the letters and was thus not called at trial. We therefore conclude that the district court did not err in denying this claim.

(ECF No. 38-9 at 3.)

Reberger wrote Harvey three letters from the Coos County Corrections facility. (ECF Nos. 18-9, 18-10, 19.) In one of the letters, Reberger wrote:

> We fucked up, I am is [sic] good as dead[,] you will be out in 10 or 20 years if your [sic] lucky but not me[.] After we go to court together you will never see me again[,] we should have never done it in the first place now we are going to pay for it big time. . . . Tell me the trueth [sic] on what you said[,] they don't know how he died[,] no camera saw that[. A]ll they can go by is what we tell them.

(ECF No. 18-9 at 3.) In a second letter, Reberger wrote, "[p]lease listen to me I want to get out of this alive[.] If you fuck up[,] I'm dead and if you don't[,] we will make it together." (ECF No. 18-10 at 4.) Reberger later wrote:

> You and me both know I did not kill him[,] he killed himself but only I really know that. We can get out of this with less time if you listen to me, and I mean it! Don't talk to anyone but your PD all they have on us is armed robbery because of the money.

(*Id.* at 5.) In a third letter, Reberger wrote, "I hope that you didn't tell the cops from Las Vegas much when you spoke to them. If we get time it will be your fault and if we get over 2 year for this[,] you will never see me again." (ECF No. 19 at 3.) Later, Reberger wrote:

> You don't know how he died only I know how and that's the trueth [sic]. . . . Amber I just hope you didn't blow it for us, but we will see if you did. We may have done a burglary[,] but we did not do anything els [sic] [and] I did not kill anyone we both know he killed himself.

(*Id.* at 4.) Reberger maintained that he did not write the letters; rather, he believed that "Detective Richard Perkins wrote all three of them [sic] Oregon incriminating letters thinking I was illiterate because Amber Harvey was illiterate." (ECF No. 37-1 at 126-27.)

Prior to the trial, Reberger's trial counsel moved to suppress the "written statements allegedly made and/or written by [Reberger] while in a custodial setting in the Coos County, Oregon Jail, Coos Bay, Oregon." (ECF No. 19-11.) The state district court denied the motion, and, at the trial, the State called Officer Jackson to explain how the letters were obtained. (ECF No. 29 at 4.) Officer Jackson testified that because Reberger was on suicide watch, "it is part of the policy to check his mail." (*Id.* at 11, 13,

28.) Reberger's letters were then given to Dale Willis, a lieutenant with the Coos County Sheriff's office, who sent them to the Henderson Police Department. (*Id.* at 32, 35-37, 43.) The State then called Harvey to testify that the letters were "the letters Lance wrote to [her]." (ECF No. 29-2 at 34.) Harvey testified that she knew Reberger wrote the letters due to his handwriting and the content of the letters. (*Id.* at 34-37) During cross-examination, Reberger's trial counsel questioned Harvey about whether she had previously told a doctor that she could not read or write and whether she had observed Reberger's handwriting on any occasion before receiving these letters. (*Id.* at 38-39.) Finally, regarding the letters, the State called William Leaver, the Las Vegas Metropolitan Police Department document examiner, who testified that he compared Reberger's letters to "a handwriting exemplar" from Reberger. (ECF No. 29-2 at 103, 107.) Leaver determined that Reberger had written the letters. (*Id.* at 108-109, 111.) Leaver also identified latent fingerprints on two of the letters that matched Reberger's. (*Id.* at 110-111.)

Later, at the post-conviction evidentiary hearing, Reberger explained that his trial counsel "failed and refused to contact [his] handwriting expert to thoroughly examine those three Oregon letters" even though he "tried to give [his trial counsel] all the information on [his] handwriting expert." (ECF No. 37-1 at 124-25.) Reberger received a letter from R. David Crisp, a forensic document examiner, stating that he "examined the documents [Reberger] sent [him] again, and [his] opinion [was] inconclusive." (ECF No. 40-5 at 2.) Mr. Crisp explained that "[a]ny examiner would have to have definite known letters or other writing from the same period, (1990), in order to make a proper examination in order to arrive at a definite opinion." (*Id.*) Reberger was also in contact with Trisha Berry of Nationwide Document Examiners, Inc. regarding the review of his handwriting and the letters. (*See* ECF No. 39-3.) Berry indicated that her colleague, Mr. Phillips, attempted to call Reberger's trial counsel, but that telephone call was not answered and not returned as of a week and a half later. (*Id.* at 4.) In one of Berry's letters, she indicated that "[i]t's important that you have comparison writing from the time

that the letters you claim convicted you were (allegedly) written." (ECF No. 39-2 at 4.) Reberger also presented testimony of his sister-in-law, Sandra Reberger, during the post-conviction evidentiary hearing. (ECF No. 37-1 at 50-51.) Sandra Reberger testified that the letters Reberger sent to her during his incarceration—unlike the letters Reberger allegedly wrote to Harvey—were in cursive handwriting, contained correct grammar, and had no spelling mistakes.

McDonald testified at the post-conviction evidentiary hearing that a handwriting expert was retained, and Reberger's letters were sent to him for his review. (ECF No. 36-2 at 95-96.) That expert, Huntzinger, concluded that "Reberger had written the letters." (*Id.* at 96.) This was the reason he was not called to testify. (*Id.*)

Because Reberger's trial counsel moved to suppress the letters, cross-examined Harvey on her ability to identify the letters, and retained an expert to analyze the letters, the Nevada Supreme Court reasonably concluded that Reberger's trial counsel were not deficient in attempting to challenge the letters. *See Strickland*, 466 U.S. at 688. Reberger asserts that his trial counsel should have retained the experts he contacted. However, Reberger's experts were not able to analyze the letters without a writing exemplar from the same time period. Reberger also asserts that his trial counsel should have challenged the letters in other ways. This argument fails because trial counsel is not required to use certain approaches to challenge evidence; rather, they are given latitude to decide how best to approach a problem. *See Harrington*, 562 U.S. at 106 ("Rare are the situations in which the wide latitude counsel must have in making tactical decisions will be limited to any one technique or approach."); *see also Strickland*, 466 U.S. at 688-89 ("No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant."). Accordingly, because the Nevada Supreme Court reasonably rejected Reberger's *Strickland* claim, Reberger is denied federal habeas relief for Ground Nine, Subpart E.

### 6. Subpart F

In Ground Nine, Subpart F, Reberger argues that his trial counsel failed to challenge Detective Richard Perkins' demonstrably false claims at the suppression hearing. (ECF No. 65 at 90.) Reberger asserts that these failures by his trial counsel prejudiced him because Detective Perkins' testimony provided probable cause for Reberger's arrest. (ECF No. 101 at 111.) In Reberger's appeal of the denial of his first state habeas petition, the Nevada Supreme Court held:

> Appellant claimed counsel did not impeach a police officer at a hearing on a motion to suppress, but he failed to state what counsel should have done to impeach the officer. . . . Further, appellant failed to state . . . how the outcome at trial would have changed had counsel acted differently. We therefore conclude that the district court did not err in denying these claims.

(ECF No. 38-9 at 6.)

Reberger takes issue with three lines of Detective Perkins' pretrial suppression hearing testimony from June 17, 1992. (*See* ECF No. 23 at 61.) Frist, Detective Perkins testified that he had "determined that Amber and Lance . . . stayed at a Shady Rest Motel in Henderson the week prior to this incident." (*Id.* at 83.) Reberger asserts that his trial counsel should have challenged Detective Perkins on this testimony because Harvey's ex-husband, Robert Harvey, told Detective Perkins in an interview on November 8, 1990, that Harvey had been staying with him at his "place for the last two or three weeks." (ECF No. 39-20 at 9.) Although Harvey also stated on November 9, 1990, that she had "been living with [her] ex-husband" prior to the incident, she also provided that she stayed in a motel with Reberger for one night around the time of the murder. (ECF No. 39-22 at 2.) Even though Detective Perkins' testimony may have been challengeable based on the timing of Harvey and Reberger's stay at the motel, the Nevada Supreme Court reasonably concluded that Reberger failed to establish prejudice. *See Strickland*, 466 U.S. at 694. Indeed, Reberger fails to demonstrate how "the result of the proceeding would have been different" had his trial counsel challenged

the fact that the motel stay was close in time to the murder as opposed to a week prior. *Id.*

Next, Reberger takes issue with Detective Perkins' testimony regarding a witness, Mary Ellen Quant. Detective Perkins testified that he had "interviewed a Mary Ellen Quant who had conversations with Miss Harvey over the telephone." (ECF No. 23 at 84.) Quant told Detective Perkins that Harvey had told her that "'[she] didn't pull the trigger; he did.'" (*Id.*) Detective Perkins explained that Quant and Harvey were good friends and that "a couple weeks prior to the incident, . . . Amber Harvey asked Mary Ellen Quant if she wanted to go with her and Lance to California; and that they were going to do something very illegal prior to going." (*Id.*)

Reberger argues that Quant and Harvey were not actually friends because during Quant's November 8, 1990, statement to Detective Perkins, she stated that Harvey "went out with my old man and stuff, and I didn't like her much and then I, look, started talkin [sic] to her and stuff like that." (ECF No. 39-20 at 5.) Contrarily, Robert Harvey stated that he would say that Harvey and Quant were friends. (ECF No. 39-21 at 3.) Further, Reberger argues that Harvey did not tell Quant that she was going to do something illegal *prior* to traveling to California. Quant's statement to Detective Perkins provided that Harvey had asked her "if [she] wanted to go to California. She asked, she said she was gonna [sic] do something [sic] illegal." (ECF No. 39-20 at 7.) The Nevada Supreme Court reasonably concluded that Reberger failed to demonstrate prejudice regarding either of these two allegedly challengeable statements. *See Strickland*, 466 U.S. at 694. The statement about Harvey and Quant being friends was supported by Robert Harvey's police statement. And Detective Perkins' testimony about Harvey stating that she was going to do something illegal was similar to her actual statement to Quant such that it cannot be concluded that "the result of the proceeding would have been different" had Reberger's trial counsel corrected Detective Perkins. *Id.*

Finally, Reberger takes issue with Detective Perkins' statements regarding Reberger's warrant. Detective Perkins testified that he instructed someone to enter a

message into the NCIC database at the end of his shift on November 8, 1990, that Reberger was on "a temporary want." (ECF No. 23 at 61, 75-76, 87-88.) Detective Perkins testified that he entered a "temporary want," which is "merely a request for apprehension if they find the suspect that you're looking for," because he believed there was probable cause to arrest Reberger. (*Id.* at 81-82, 89.) Detective Perkins applied for the actual warrant the following morning, November 9, 1990, but that application was denied. (*Id.* at 70, 87-88.) The warrant for Reberger's arrest was not secured until "[a]fter [law enforcement] traveled to Coos Bay and . . . talked to Mr. Reberger." (*Id.* at 96.)

Reberger argues that this testimony should have been impeached because, in response to the Coos Bay Police Department's message on November 9, 1990 that they had Reberger in custody (ECF No. 39-6 at 2), the operator at the Henderson Police Department provided that Reberger's "temporary warrant has been confirmed" (ECF No. 39-7 at 2). The operator at the Henderson Police Department also reported later that day, November 9, 1990, that "we have 2 detectives that are our [sic] district atty's office right now picking up the warrants." (ECF No. 40-8 at 2.) These messages that a warrant was being secured and picked up appear to be untrue based on the fact that the application for Reberger's warrant was originally denied. However, importantly, Reberger's trial counsel did impeach Detective Perkins with this information. In response to Reberger's trial counsel's question, Detective Perkins admitted that a warrant had not been granted even though he had previously sent a "telex out indicating [he was] walking a warrant." (ECF No. 23 at 70.) Also, in response to a question posed by Reberger's trial counsel, Detective Perkins admitted that there was no "warrant in existence at 1:45 a.m. on November 9, 1990, as to Mr. Reberger" even though he had "put a temporary want" into NCIC for Reberger at that time. (*Id.* at 75-76.) Accordingly, because Reberger's trial counsel adequately impeached Detective Perkins, the Nevada Supreme Court reasonably concluded that Reberger's ineffective assistance of counsel claim should fail. *See Strickland*, 466 U.S. at 688, 694.

Reberger is denied federal habeas relief for Ground Nine, Subpart F.

### 7. Subpart G

In Ground Nine, Subpart G, Reberger argues that his trial counsel failed to challenge the search warrant of his vehicle. (ECF No. 65 at 92.) In Reberger's appeal of the denial of his first state habeas petition, the Nevada Supreme Court held:

> Appellant claimed that counsel failed to investigate . . . the search warrant for his vehicle, . . . but he failed to state what the results of such investigations would have been. Further, appellant failed to state . . . how the outcome at trial would have changed had counsel acted differently.

(ECF No. 38-9 at 6.)

The search warrant application explained that Harvey and Reberger were arrested "on outstanding fugitive complaints" and that Harvey had given a taped statement. (ECF No. 18-6 at 3.) Harvey told law enforcement that Reberger "robbed the Fantasy Video and shot the clerk three times in the head. That she and Lance drove to Fantasy Video in the vehicle owned by Lance Reberger. That Amber described that vehicle as a Camero, black in color." (*Id.*) Following Harvey and Reberger's arrests, the "1977 Chevrolet Camero, black in color bearing Florida license # HLG 89L was taken into custody, sealed, and transported to the Coos Bay City shops, pending a search warrant." (*Id.*) The application sought a search of the vehicle for the murder weapon, ammunition, cameras, currency, pipes, business cards, sexual novelties, shell casings, cassette tapes, and other property connected to the store. (*Id.* at 3-4.) Detective Perkins testified that "a folding-type knife" and five .22 caliber bullets were found as a result of the search warrant of Reberger's vehicle. (ECF No. 28-2 at 9, 15-16, 26.)

The Nevada Supreme Court reasonably determined that Reberger failed to demonstrate prejudice because he failed to demonstrate how the result of the trial would have changed had his trial counsel challenged the search warrant. *See Strickland*, 466 U.S. at 694. Although a successful challenge of the search warrant could have suppressed the introduction of the knife and bullets found in Reberger's vehicle, there still would have been evidence presented that Reberger wrote incriminating letters to Harvey (ECF Nos. 18-9, 18-10, 19), Reberger admitted to his former cellmate that he

shot someone (ECF No. 29-1 at 43-45, 50), and Reberger told Harvey at the jail that she did not have anything to worry about because she was not in the room when it happened (ECF No. 29 at 4, 10). Accordingly, because the Nevada Supreme Court reasonably denied Reberger's *Strickland* claim, Reberger is denied federal habeas relief for Ground Nine, Subpart G.

### 8. Subpart H

In Ground Nine, Subpart H, Reberger argues that his trial counsel failed to object to Jury Instruction Number 16, which provided that intent may be proven by circumstantial evidence, because it allowed the jury to draw an adverse inference from his silence at trial. (ECF No. 65 at 92-93.) Reberger also asserts that his trial counsel should have requested a no-adverse-inference instruction. (*Id.* at 93.)

Reberger presented this argument in his appeal of the denial of his first state habeas petition. (*See* ECF No. 38-6 at 83-84). However, the Nevada Supreme Court did not address this argument in its order. (*See* ECF No. 38-9.)

28 U.S.C. § 2254(d) generally applies to unexplained as well as reasoned state-court decisions: "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington*, 562 U.S. at 99. When the state court has denied a federal constitutional claim on the merits without explanation, the federal habeas court "determine[s] what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the United States Supreme] Court." *Id.* at 102; *see also Johnson v. Williams*, 568 U.S. 289, 301 (2013) ("When a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits.").

Jury Instruction Number 16 provided:

Intent may be proved by circumstantial evidence. It rarely can be established by any other means. While witnesses may see and hear and thus be able to give direct evidence of what a defendant does or fails to do, there can be no eyewitness account of a state of mind with which the acts were done or omitted, but what a defendant does or fails to do may indicate intent or lack of intent to commit the offense charged.

In determining the issue as to intent, the jury is entitled to consider any statements made and acts done or omitted by the accused, and all facts and circumstances in evidence which may aid determination of state of mind.

(ECF No. 30-1 at 17.) Contrary to Reberger's contention, Jury Instruction Number 16 did not allow the jury to draw an adverse inference from his silence at trial. In fact, Jury Instruction 16 does not discuss trial testimony; rather, it simply discusses a defendant's actions and omission related to the commission of the crime. Because Jury Instruction 16 does not permit the jury to make impermissible inferences as Reberger claims, his trial counsel was not deficient in not objecting to it. *See Strickland*, 466 U.S. at 688.

Regarding Reberger's assertion that his trial counsel failed to request a no-adverse-inference instruction regarding his decision to remain silent, Reberger's trial counsel specifically indicated that he did not want the state district court "to give the instruction on remaining silent."[7] (ECF No. 30-2 at 43.)  Reberger's trial counsel did not explain the reasoning behind this decision. However, Reberger fails to demonstrate that this decision was deficient. *See Strickland*, 466 U.S. at 688. Although the jury was not specifically instructed that they could not make an adverse inference regarding Reberger's decision to remain silent, when reviewing the instructions as a whole, it can be concluded that such an instruction was implied. *See Estelle*, 502 U.S. at 72. Indeed, the jury was strictly instructed regarding what they were allowed to consider in their deliberations, and Reberger's silence was not included. (*See* ECF No. 30-1 at 10 (Jury Instruction Number 9 instructed the jury that "[t]he evidence which you are to consider in this case consists of the testimony of the witnesses, the exhibits, and any facts

---

[7]It is noted that Reberger did not testify "because of the alleged, supposed, bogus confession they said I said." (ECF No. 30-2 at 37.)

admitted or agreed to by counsel").) Because the Court determines that fairminded jurists would agree that this reasoning establishing that Reberger's federal constitutional rights were not violated was not inconsistent with prior decisions of the United States Supreme Court, *Harrington*, 562 U.S. at 102, Reberger is not entitled to relief on Ground Nine, Subpart H.

## V.    CERTIFICATE OF APPEALABILITY

This is a final order adverse to Reberger. As such, Rule 11 of the Rules Governing Section 2254 Cases requires this Court to issue or deny a certificate of appealability ("COA"). Therefore, the Court has *sua sponte* evaluated the claims within the petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the court's procedural ruling was correct. *See id.*

Applying these standards here, the Court finds that a certificate of appealability is warranted for Reberger's *Brady* claim contained in Ground One. Reasonable jurists could debate whether prejudice ensued from the State's suppression of the deal with Harvey for her testimony against Reberger. Although the State introduced evidence of incriminating letters Reberger wrote to Harvey, testimony from Reberger's former cellmate that Reberger admitting to shooting someone, and testimony that a correctional officer overheard Reberger tell Harvey that she did not have anything to worry about because she was not in the room when it happened, Harvey's testimony that Reberger shot the victim was otherwise uncorroborated and was relied upon heavily by the State.

Evidence that there was a deal between the State and Harvey would have severely impeached her testimony, such that reasonable jurists could debate whether the confidence in Reberger's verdict was undermined pursuant to *Brady*.

This court declines to issue a certificate of appealability for its resolution of any procedural issues or any of Reberger's habeas claims on the remaining grounds.

**VI.    CONCLUSION**

It is therefore ordered that the Second Amended Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (ECF No. 65) is granted for Ground One's *Napue* claim. Lance Reberger will be released from custody within 60 days unless the Respondents file in this action, within that 60-day period, a written notice of election to retry Reberger, and the State thereafter, within 180 days after the filing of that notice, commences proceedings toward the retrial. Any party may request a reasonable modification of the time limits set forth in this paragraph.

The judgment in this action will be stayed pending the conclusion of any appellate or certiorari review in the Ninth Circuit Court of Appeals or the United States Supreme Court, or the expiration of the time for seeking such appellate or certiorari review, whichever occurs later.

It is further ordered that Reberger is granted a certificate of appealability for Ground One's *Brady* claim. It is further ordered that a certificate of appealability is denied as to Reberger's remaining grounds.

The Clerk of Court is directed to enter judgment accordingly.

DATED THIS 23rd day of March 2020.

_____
MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE